# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                            No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER[1]

---

[1]On January 22, 2018, the Court issued a sealed version of this Memorandum Opinion and Order. See Sealed Memorandum Opinion and Order, filed January 22, 2018 (Doc. 1674)("Sealed MOO"). In it, the Court "order[ed] that Garcia send to the Court any

**THIS MATTER** comes before the Court on the Defendant Christopher Garcia's Sealed Motion to Suppress Statements by Defendant Obtained in Violation of <u>Miranda v. Arizona</u>; Motion to Suppress Involuntary Statements by Defendant; Request for Hearing Pursuant to 18 U.S.C. § 3501, filed March 1, 2017 (Doc. 184)("Motion to Suppress").[2]  The Court held evidentiary hearings on April 13, 2017, and May 4, 2017.  The primary issue are: (i) whether the Court should suppress statements that Defendant Chris Garcia made during an interrogation with Nathan Lerner -- a sergeant with the Bernalillo County Sherriff's Department -- and FBI Special Agent Joe Sainato, because Garcia invoked his right to counsel before the interrogation by telling Lerner "My attorney is Robert Gorence"; and (ii) whether the Court must exclude all of Garcia's statements from the interrogation under <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)("<u>Miranda</u>") and <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004)("<u>Seibert</u>"), because Sainato did not give Garcia a <u>Miranda</u> warning until sixteen minutes into the interrogation.  The Court concludes that Garcia did not invoke his right to counsel before the interview, because Garcia was not yet subject to custodial interrogation, as required to trigger <u>Miranda</u> protections.  The Court will, accordingly, not suppress Garcia's statements on those grounds.  The Court will also not suppress the testimony obtained after the late <u>Miranda</u> warning,

---

proposed redactions, if any are necessary to protect confidential information, within ten calendar days. After ten calendar days, the Court will file a public version of this Memorandum Opinion and Order."  Sealed MOO at 1-2 n.1.  Garcia did not send the Court proposed redactions. Accordingly, the Court files a public version of the Sealed MOO.

[2]Garcia originally filed the Motion to Suppress in <u>United States v. Garcia</u>, No. 15-4275. Pursuant to the Court's oral order on November 9, 2017, <u>see</u> Transcript of Motion Proceedings at 159:7-17, taken November 9, 2017, (Court),  filed November 20, 2017 (Doc. 1457), the Motion to Suppress was deemed also filed in <u>United States v. DeLeon</u>, No. 15-4268, <u>see</u> Notice per Court's Ruling of Incorporation of Motions and Related Transcripts from 15-CR-4275 Needing the Court's Decision at 1, filed November 28, 2017 (Doc. 1486).  Unless otherwise noted, all further citations to a document number will correspond with documents filed in <u>United States v. Garcia</u>, No. 15-4275.

because Sainato did not deliberately issue the warning late. Rather, the evidence suggests it was a good-faith mistake. The Court will suppress, however, the statements Garcia made before the <u>Miranda</u> warning, because, once questioning began, Garcia had been subjected to custodial interrogation. The Court, accordingly, grants in part and denies in part the requests in the Motion to Suppress.

## **<u>FACTUAL BACKGROUND</u>**

The Court takes its background facts from the Second Superseding Indictment, No. 15-4268, filed March 9, 2017 (Doc. 947)("Indictment"). The background facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, 2017 WL 6496441, No. 15-4268, filed December 18, 2017 (Doc. 1585). The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background largely reflects the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that the Syndicato[3] de Nuevo Mexico ("SNM") allegedly committed through its members. <u>See</u> Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of

---

[3]The correct spelling of "Syndicato" has been hotly debated. The proper Spanish spelling for the word syndicate is "sindicato." Real Academia Española, Asociación de Academias de la Lengua Española, Diccionario de la Lengua Española, <u>Sindicato</u> (23d ed. 2014). The indictment, the media, and, at least some members of the gang, however, spell it "Syndicato." Indictment at 2, Colleen Heild, <u>Ex-Gang Members Help Break Grip of Massive Prison Gang SNM</u>, The Albuquerque Journal, September 10, 2017, at 1. <u>See</u> Draft Transcript of Motion Proceedings, (taken January 10, 2018) at 3:22-24 (Armijo)("I believe . . . both spellings are used by members. We have members that have tattoos with both the Y and the I."). The Court will spell it "Syndicato," because that is the spelling on the indictment.

individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. <u>See</u> Superseding Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. <u>See</u> Superseding Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members at one time. <u>See</u> Indictment at 3. SNM has approximately 250 members now and is led by "a 'panel' or 'mesa' (Spanish for table) of leaders who issue[] orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. <u>See</u> Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals; its main goal is controlling and profiting from narcotics trafficking. <u>See</u> Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. <u>See</u> Indictment at 4. If another gang does not abide by SNM's demands, SNM may assault or kill one of the other gang's members to show its power. <u>See</u> Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. <u>See</u> Indictment at 4. SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any

suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Indictment at 5.  To preserve its power, SNM uses intimidation, threats of violence, assaults, and murder.  See Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See Indictment at 8.  SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials, including Wayne Santistevan and Gregg Marcantel, inspired the Federal Bureau of Investigation's present investigation.  See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133); Transcript of Motion Proceedings at 228:23-24 (held November 29, 2017)(Castellano), No. 15-4268, filed December 6, 2017 (Doc. 1547).  The other relevant facts giving rise to this Memorandum Opinion and Order are as follows.

### FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure states: "When factual issues are involved in deciding a motion, the court must state its essential findings on the record."  Fed. R. Crim. P. 12(d).  The Court makes these findings under rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982)("[U]nder Rule[] 104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'")(quoting United States v. Matlock, 415 U.S. 164, 174 (1974)).  The Court makes the following finding of fact in accordance with rule 12(d) of the Federal Rules of Criminal Procedure:

1.      At some point on December 2, 2015, Garcia, a forty-year-old man, took some Xanax and Oxycodone.[4] See Intake Screen at 1 (dated December 4, 2017 19:55 p.m.), filed March 1, 2017 (Doc. 184-4)("Intake Screening")(noting that Garcia had taken Xanax and Oxycodone two days before intake screening); Patient RX History Report for Chris Garcia at 2 (dated April 5, 2016), filed March 1, 2017 (Doc. 184-2)("Patient History")(noting that Garcia had fulfilled a thirty-day Oxycodone prescription on December 2, 2015 and a thirty-day Alprazolam prescription on November 4, 2015). The amount he ingested of either drug is unknown.

2.      At about 4:15 a.m. on December 3, 2015, Garcia was arrested at his home on drug dealing charges and placed in the back of a police car. See Redacted Superseding Indictment at 1-2, filed March 16, 2016 (Doc. 49)("Garcia Indictment"); Transcript of Motion Proceedings at 138:20-21 (held April 13, 2017)(Lerner), filed May 3, 2017 (Doc. 254)("April Tr."); Transcript of Motion Proceedings at May Tr. at 22:23-25 (held May 4, 2017)(Adams, Sainato), filed May 12, 2017 (Doc. 264)("May Tr.").

3.      While Garcia was secured in the car, Lerner -- a sergeant with the Bernalillo County Sheriff's Department -- told Garcia that he was under arrest and that they were taking Garcia to talk to agents of the Federal Bureau of Investigation. See April Tr. at 141:13-15 (Lerner); id. at 158:2-4 (Lerner). Lerner did not make these statements accusatorily or threateningly. See April Tr. at 141:4-8 (Lerner)("I opened the door, Hey, it's me, so and so.

---

[4]Xanax, a brand name for Alprazolam, acts on the central nervous system to produce a calming effect. See Alprazolam, WebMD, https:// www.webmd.com/drugs/2/drug-8171-7244/alprazolam-oral/alprazolam-oral/details. Oxycodone is an opioid that relieves moderate to severe pain. See Oxycodone HCL solution, WebMD, https://www.webmd.com/drugs/2/drug-1025-5278/oxycodone-oral/oxycodone-oral/details.

We're going to talk to you, we'll tell you all about what's going on in the car when we get to the office.").

    4.    Garcia said in response, "My attorney is Robert Gorence."   April Tr. at 158:4-5 (Lerner).  See id. at 157:18 (Lerner).[5]

---

[5]Lerner equivocates on the exact wording Garcia used.  Lerner says three times that Garcia said: "My attorney is Robert Gorence."   April Tr. at 157:18 (Lerner); id. at 158:4-5.  See id. at 157:8-10 (Lerner, Sirignano).   Later, the following exchange took place:

    Q.    At no time did you tell Agent Sainato that Mr. Garcia asked for a lawyer, or that he'd mentioned Bob Gorence in the car?

    A.    He mentioned Bob Gorence; right?

    Q.    What's that?

    A.    He asked to -- "You know, I know Bob Gorence" -- I don't even know what he said.  He said something about Bob Gorence; right? But he didn't ask: I need my lawyer here, I want my lawyer here.

    . . . .

    Q.    Bob Gorence is a lawyer?

    A.    Yes, he is.

    Q.    He said, "Bob Gorence is my lawyer"?

    A.    Yes, he --

    Q.    You didn't call Bob Gorence?

    A.    -- he didn't say Bob Gorence is my lawyer.  He says, "I know Bob, I'm going to call Bob Gorence."

April Tr. at 163:25-164:24 (Lerner, Sirignano).  There is no other evidence about what Garcia said in the car.  The Court concludes that Garcia said "Robert Gorence is my attorney," because Lerner affirmed three times that Garcia said "Robert Gorence is my attorney," and backtracked that statement only after Garcia's counsel pressed that Garcia had invoked his right to counsel by asking for an attorney.  April Tr. at 158:4-5.  See id. at 163:25-164:2 (Sirignano).

5.      Mr. Gorence is a prominent New Mexico defense lawyer.  <u>See</u> Robert J Gorence, Gorence & Oliveros, P.C., available at  <u>http://www.golaw.us/index.php/</u> about/52-robert-j-gorence.  He is also a former Assistant United States Attorney and former First Assistant and Chief of the Criminal Division.  <u>See</u> Robert J Gorence, Gorence & Oliveros, P.C., available at <u>http://www.golaw.us/index.php/</u>about/52-robert-j-gorence. Lerner knew that Mr. Gorence was a New Mexico defense attorney.  <u>See</u> April Tr. at 163:22-24 (Lerner, Sirignano)

6.      Lerner asked Garcia no questions in the car.  <u>See</u> 141:9-10 (Lerner, Sirignano).

7.      Lerner subsequently drove Garcia to a New Mexico probation office facility for questioning.  <u>See</u> April Tr. at 133:20-21 (Lerner).

8.      Garcia's interview with Lerner and FBI Special Agent Joe Sainato began at 5:55 a.m.  <u>See</u> Confidential Transcript of Redacted Post-Arrest Interview of Christopher Garcia at 3:1-6 (taken December 3, 2015)(Sainato), filed March 1, 2017 (Doc. 184-5)("Int. Tr.").

9.      Garcia was not handcuffed during the interview.  <u>See</u> May Tr. at 25:4-5 (Sainato).[6]

10.     Garcia was also given water and a doughnut during questioning.  <u>See</u> April Tr. at 175:8-10 (Lerner); May Tr. at 118:19 (Sainato).

---

[6]Lerner testified that "I believe [Garcia] was cuffed in front" for the interview, Int. Tr. at 143:19 (Lerner), but that the handcuffs might have been taken off at some point, <u>see</u> <u>id.</u> at 175:3-5 (Armijo, Lerner)("Q. . . .  Do you recall if he was -- the handcuffs were taken off? A. I don't remember, they might have been.").  Sainato, on the other hand, unambiguously stated, not once, but twice, that "[G]arcia was uncuffed during the interview."  May Tr. at 25:4-5 (Sainato).  <u>See</u> <u>id.</u> at 118:15-16 ("[H]e was not cuffed during the interview.").  The Court credits Sainato's surefooted statements and determines that Garcia was not cuffed during the interview.  The Int. Tr. corroborates this finding, as the interview concludes with Lerner telling Garcia that they would be cuffing Garcia in the front to take him out of the room.  <u>See</u> Int. Tr. at 212:18-19 (Lerner).

11. Neither Lerner nor Sainato gave Garcia his <u>Miranda</u> warnings before the interview began. <u>See</u> Int. Tr. at 3:1 (Sainato); <u>id.</u> at 20:21-22 (Sainato).

12. Instead, Sainato and Lerner asked Garcia various questions about SNM and Garcia's involvement with the gang. <u>See</u> <u>e.g.</u>, Int. Tr. at 5:4-6 (Lerner); <u>id.</u> at 5:15-17 (Lerner); 7:19 (Sainato).

13. Garcia responded to these questions in a thick, throaty voice, but he answered quickly and responsively. <u>See</u> Redacted Audio Interview at 0:01-15:37 (recorded December 3, 2015)(Garcia, Lerner, Sainato), Gov. Hearing Ex. 2, ("Interview Recording").

14. Garcia was talkative during the interview, and his answers were often narrative. <u>See</u>, <u>e.g.</u>, Int. Tr. at 19:11-20 (Garcia); <u>id.</u> at 23:14-25 (Garcia); <u>id.</u> at 91:15-92:6 (Garcia); <u>id.</u> at 92:8-93:1 (Garcia).

15. Garcia told them he had joined SNM in 1999. <u>See</u> Int. Tr. at 5:18 (Garcia).

16. Two SNM members had vouched for his entry into the gang: "Anthony Apodaca -- and Dennis Trujillo." Int. Tr. at 7:18 (Garcia); <u>id.</u> at 8:24-25 (Garcia, Lerner).

17. Garcia implied that SNM had admitted him for stabbing a man. <u>See</u> Int. Tr. at 9:1-25 (Garcia, Lerner, Sainato).[7]

---

[7]Garcia is equivocal whether he actually stabbed the man and thus the Court will make no finding that Garcia stabbed anyone to get into SNM. The relevant transcript portions read:

Sergeant Lerner: . . [Y]ou have to do something to get in, right? How did you earn your bones?

. . . .

Mr. Garcia: I -- I didn't do nothing.

. . . .

Special Agent Sainato: Chris, let me interject there. The only way this is going to

18.     Garcia also told them that he did not know who had ordered the murder of Gregg Marcantel, the New Mexico Secretary of Corrections.  See Int. Tr. at 3:22 (Garcia).

19.     As Garcia was discussing SNM members' leadership positions, including a member nicknamed Styx, Sainato realized he had not given Garcia Miranda warnings.  See Int. Tr. at 20-21 (Sainato).

20.     The following exchange then took place:

Special Agent Sainato[8]:  [I forgot][9] to do this.

[Sergeant Lerner[10]]:  Really?

[Special Agent Sainato]:  You haven't told us anything bad, right?  We need to -- my bad, dude.  I started filling this out, and then I totally got sidetracked because you told me something exciting and I like listening to you, but let's do this real quick

Mr. Garcia:  and -- and I still don't understand.[11]  Like what --

_____

work is if you're straight up with us. . . .  We're going to be straight up with you.

Mr. Garcia: Well, I can.  I got locked up for -- I done time in the north, whatever.  They said I was involved in a stabbing. . . .  Somebody got stabbed a couple of times, a white dude.  You know what I mean?

Int. Tr. at 9:2-9:25 (Garcia, Lerner, Sainato).

[8]The Int. Tr. mistakenly spells Sainato's last name as Stainato.  In its citations to the Int. Tr., the Court uses the correct spelling.

[9]The Int. Tr. reads "[w]e're going to have to do this," but Sainato corrected that statement at the May Hearing to "I forgot to do this."  May Tr. at 58:23-24 (Sainato).  The Court credits Sainato's correction after listening to the audio recording of the interview and incorporates it as a finding of fact.

[10]The Int. Tr. credits this statement to Sainato, but Sainato noted that Lerner actually said it.  See May Tr. at 59:20-21 (Sainato).  The Court Credits Sainato's correction after listening to the audio recording of the interview and incorporates it as a finding of fact.

[11]Garcia suggests that his statement that "I don't understand" refers to his Miranda rights.  Motion to Suppress at 9.  The Court concludes that, based on the transcript's context and listening to the audio recording of the interview, Garcia's comment that "I still don't understand"

Sergeant Lerner:  We're getting -- he's got --

Special Agent Sainato: Yeah, my bad, dude.  I meant to do this before we got started.  So the time is 6:11.  Chris, before we really talk to you, you must understand your rights.  You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions.  You have a right to have a lawyer with you during questioning.  If you can't afford a lawyer, one can be appointed for you before questioning if you wish.  If you decide to answer any questions now, without a lawyer present, you have the right to stop answering at any time.  So if you can just read out loud the consent part.

Mr. Garcia: Okay.  I -- okay.  I have read this statement of my rights.  I understand what my rights are.  At this time I am willing to answer questions without a lawyer present.

Special Agent Sainato: Is that cool?

Mr. Garcia: Okay. Yeah.

Special Agent Sainato: Yeah.  Sorry.  I meant to do that before we started.

Sergeant Lerner: So now we're going to have to go over everything again?

Special Agent Sainato: No.

Sergeant Lerner: We can put it in --

Mr. Garcia: Because I can even say on the recording that I understand what happened and everything is fine.  I'm not against it.  You know what I mean?

Int. Tr. at 20:9-21:23 (Garcia, Lerner, Sainato).

21.     Garcia then signed an FBI "Advice of Rights" form indicating that he understood

his Miranda rights and was "willing to answer questions without a lawyer present."  Federal

Bureau of Investigation Advice of Rights at 1 (dated December 3, 2015, 6:12 a.m.), filed March

29, 2017 (Doc. 226-1)("Advice of Rights").

refers to the previous conversation about Styx and not about his Miranda rights.  At this point, Sainato had not made clear orally that he had forgotten to give the Miranda warning, so Garcia's comment cannot be in reference to his Miranda rights.

22.     The trio then resumed discussing Styx.  <u>See</u> Int. Tr. at 22:2 (Lerner).

23.     Garcia's questioning continued for approximately two hours and forty five more minutes.  <u>See</u> Int. Tr. at 213:9-10 (Sainato).

24.     In that time, they discussed: (i) current SNM leaders and members, <u>see</u> Int. Tr. at 44:8-46:4 (Garcia, Lerner, Sainato); <u>id.</u> at 52:2-14 (Garcia, Lerner, Sainato); (ii) why and whether SNM ordered various murders, <u>see</u> Int. Tr. at 25:1-3 (Sainato); <u>id</u> at 43:20-44:16 (Garcia, Lerner); <u>id.</u> at 61:1-22 (Garcia, Lerner); <u>id.</u> at 63:19-64:12 (Garcia, Lerner); <u>id.</u> at 66:10-68:13 (Garcia, Lerner); <u>id.</u> at 137:23-140:2 (Garcia, Lerner, Sainato); (iii) whether SNM would ever order a murder on federal agents or a judge, <u>see</u> Int. Tr. at 34:15-18 (Lerner); (iv) a discussion Garcia had with "Pup" -- Anthony Ray Baca, an SNM leader -- about loyalty to SNM, Baca's orders to Garcia about killing Santistevan and Marcantel, and Garcia's subsequent actions to obtain a gun, <u>see</u> Int. Tr. at 83:7-113:16 (Garcia, Lerner, Sainato); <u>id.</u> at 140:18-145:21 (Garcia, Lerner, Sainato); <u>id.</u> at 149:18-25 (Garcia, Lerner); <u>id.</u> at 166:5-167:1 (Garcia, Myers);[12] (v) the murder of Charisma Flores, <u>see</u> Int. Tr. at 137:23-140:2 (Garcia, Sainato); (vi) the murder of George Jaramillo, <u>see</u> Int. Tr. at 147:9-17 (Garcia, Lerner); and (vii) Shane Dix's murder,[13] <u>see</u> Int. Tr. at 174:16-177:20 (Acee, Garcia, Lerner, Myers, Sainato); <u>id.</u> at 179:1-181:9 (Garcia, Lerner, Myers, Sainato).

---

[12]About two hours into questioning Garcia, FBI Special Agents Bryan Acee and Mark Myers joined the interview.  <u>See</u> Int. Tr. at 158:24-159:3 (Acee, Lerner, Myers).

[13]Based off of the Int. Tr. and the subsequent report that Sainato wrote, the Court surmises that Charisma Flores', George Jaramillo's, and Shane Dix's murders are unsolved homicides from the New Mexico area.  <u>See</u> Int. Tr. at 136:7-9 (Sainato)("So you're in a position -- helping us clear up some homicides would really help your time); <u>id.</u> at 163:13-21 (Myers)("We want homicides. . . .  We're doing unsolved homicides is what we're here to talk about."); Federal Bureau of Investigation Report at 2-3, dated December 10, 2015, filed March 1, 2017 (Doc. 184-1); Colleen Heild, <u>Syndicato was on a 'mission to kill' corrections chief</u>, The Albuquerque Journal,  April 28, 2016 at 1.  The Court does not make this a finding of fact, because it does not have sufficient evidence to come to that conclusion.

25.     Acee, Lerner, Myers, and Sainato did not use or threaten to use physical force against Garcia during the interview.  See generally Int. Tr. at 3:1-214:8.

26.     Lerner and Sainato spent the majority of the interview attempting to establish Garcia's connection to and possession of a gun, which SNM planned Mario Montoya to use in the murder or murders of senior New Mexico Department of Corrections staff.  See Int. Tr. at 88:1-125:11 (Garcia, Lerner, Sainato); id. at 127:1-131:7 (Garcia, Lerner, Sainato); id. at 140:5-158:23 (Garcia, Lerner, Sainato); id. at 166:1-174:9 (Acee, Garcia, Lerner, Myers, Sainato); id. at 182:1-17 (Garcia, Lerner); id. at 186:10-16 (Garcia, Lerner, Sainato); id. 194:1-198:2 (Garcia, Lerner, Sainato); Federal Bureau of Investigation at 2, (written December 10, 2015), filed March 1, 2017 (Doc. 184-1)("FBI report").

27.     Lerner and Sainato asked all of their questions about the gun after Garcia's Miranda warning.  See Int. Tr. at 21:11; id.. at 88:1-198:2.

28.     Garcia never admitted to having the gun.  See Int. Tr. at 93:4-5 (Garcia)("I never touched it.  I never touched it."); id. at 116:16-18 (Garcia)("Look, I'm telling you . . . it was his gun."); id. at 127:23-25 (Garcia)("I never -- I never had possession of [the gun] to give it to him."); id. at 141:15 (Garcia)("No, I never gave him the gun."); id. at 166:22-23 (Garcia)("I never touched it.  I never touched it."); id. at 211:22-212:1 (Garcia); FBI Report at 2.

29.      Information on the gun and the various murders were the most important pieces of evidence Lerner and Sainato were trying to gather.  See Int. Tr. at 204:20-25 (Lerner, Sainato)("I need you to be honest about the murders and the guns, dude. . . .  I don't care about dope.  I don't give a shit about dope, dude.").

30.     A grand jury later indicted Garcia for, among other things, being a felon in possession of a firearm and using and carrying a firearm during and in relation to a crime of violence.  <u>See</u> Indictment at 15-16.

31.     As related to <u>United States v. Garcia</u>, Garcia told Lerner and Sainato he purchased heroin from a man named Tawas.  <u>See</u> Int. Tr. at 199:20 (Garcia).

## **PROCEDURAL HISTORY**

In <u>United States v. DeLeon</u>, a grand jury indicted Garcia with: (i) Violent Crimes in Aid of Racketeering (Conspiracy to Commit Murder), 18 U.S.C. § 1959(a)(5); (ii) Felon in Possession of a Firearm, 18 U.S.C. § 922(g); and (iii) Using and Carrying a Firearm During and in Relation to a Crime of Violence, 18 U.S.C. § 924(c).  <u>See</u> Indictment at 15-16.  In <u>United States v. Garcia</u>, a grand jury indicted Garcia with: (i) four counts of distribution of a controlled substance, 21 U.S.C. § 841(a)(1), (b)(1)(B)-(C); and (ii) two counts of possession with intent to distribute a controlled substance, 21 U.S.C. § 841(a)(1), (b)(1)(B), (b)(1)(D), 18 U.S.C. § 2.  <u>See</u> Garcia Indictment at 1-3.

### 1.     **The Motion to Suppress.**

Garcia moves to suppress the statements he made during his December 3, 2015, interview.  <u>See</u> Motion to Suppress at 1.  He rallies four arguments in favor of suppression.  <u>See</u> Motion to Suppress at 5-10.  First, he argues that Lerner and Sainato took his statements without a proper <u>Miranda</u> waiver.  <u>See</u> Motion to Suppress at 6.  Garcia asserts that he never signed a written waiver form, despite the United States' representations to the contrary.  <u>See</u> Motion to Suppress at 6.  He also argues that his oral waiver "was a mere recitation of a document" placed in front of him "rather than a meaningful question-and-answer," and, thus, cannot constitute proper oral waiver.  Motion to Suppress at 6-7.

Second, he argues that any waiver obtained is invalid, because Sainato gave a "midstream" or mid-interview <u>Miranda</u> warning. Motion to Suppress at 7 (citing <u>Seibert</u>, 542 U.S. 600 (2004)). According to Garcia, a midstream <u>Miranda</u> warning is proper only if the surrounding circumstances indicated to Garcia "that the warnings presented a meaningful opportunity for him to terminate the interrogation." Motion to Suppress at 8. Garcia contends that the circumstances surrounding his <u>Miranda</u> warning did not indicate to him that he could stop the questioning and ask for an attorney, because Sainato and Lerner "treated the second portion of the interrogation as continuous with the first." Motion to Suppress at 7. Garcia adds that Sainato presented the warning as "a brief, cursory interruption to the line of questioning" and that Garcia was "clearly intoxicated and confused." Motion to Suppress at 8. He concludes, therefore, that his <u>Miranda</u> waiver was not knowing and voluntary. <u>See</u> Motion to Suppress at 8.

Third, Garcia asserts that being intoxicated independently demonstrates that his <u>Miranda</u> waiver was not knowing and voluntary. <u>See</u> Motion to Suppress at 8-9. According to Garcia, he was "highly intoxicated," because he had "ingested significant quantities of Hydrocodone and Xanax" before the interview. Motion to Suppress at 2, 8. He contends that his state of intoxication is apparent from his "rambling and disjointed" answers. Motion to Suppress at 9. He adds that he stated during the Agent's preamble to the <u>Miranda</u> warning: "I still don't understand." Motion to Suppress at 9. From those facts, he concludes that he was intoxicated and that his statements should therefore be suppressed. <u>See</u> Motion to Suppress at 9.

Finally, Garcia argues that the totality of the circumstances demonstrate that he made his statements involuntarily. <u>See</u> Motion to Suppress at 9-10. According to Garcia, the totality of the circumstances demonstrate that: (i) he was intoxicated for the interview; (ii) he did not understand from the midstream <u>Miranda</u> warning that he could stop the interrogation; and (iii) he

did not waive his rights orally or in written format.  See Motion to Suppress at 9-10.  He concludes, accordingly, that his "December 3, 2015 statement was involuntarily made, and must be suppressed."  Motion to Suppress at 10.

**2.      The Response.**

The United States responds that the Court should deny the Motion to Suppress, because Garcia's Miranda waiver was knowing, voluntary, and intelligent.  See United States Sealed Response to Defendant's Motion to Suppress Statements by Defendant Obtained in Violation of *Miranda v. Arizona*; Motion to Suppress Involuntary Statements by Defendants; Request for Hearing Pursuant to 18 U.S.C. § 3501 at 1, filed March 29, 2017, (Doc. 226)("Response").  First, the United States contends that, contrary to Garcia's assertion, Garcia signed a Miranda waiver and provides a copy of that waiver.  See Response at 4; Advice of Rights at 1.  It also contends that Garcia's oral consent to questioning sufficiently waived his rights, because he "had no questions about his rights, and agreed to keep talking to the officers after being advised of his rights."  Response at 4.

The United States next argues that Mr. Garcia's midstream-Miranda argument is unavailing.  See Response at 4.  It asserts that Sainato's Miranda warning was proper, because Sainato and Lerner did not purposefully avoid reading Garcia his rights in an effort to obtain a pre-Miranda warning confession, as the law-enforcement agent had done in Siebert.  See Response at 4-5 (citing Siebert, 542 U.S. at 605-06).  The United States contends that Garcia had not confessed to anything before Sainato gave the Miranda warning.  See Response at 5.  It adds that Garcia had no problem with the midstream warning, because Garcia said immediately afterwards: "I can even say on the recording that I understand what happened and everything is fine.  I'm not against it."  Response at 5 (citing Int. Tr. at 21:20-23 (Garcia)).

The United States also argues that Garcia was not so intoxicated during the interview as to warrant suppression of his statements. <u>See</u> Response at 5. It explains that, over the course of a three-hour interview, Garcia was able to "recall old events, discuss the SNM, give his opinion of the SNM, all while not making very incriminating statements as to specific crimes." Response at 6. The United States asserts that, when compared to other recordings it has of Garcia, it is clear that Garcia was not intoxicated during the December 3, 2015, or at least not so intoxicated as to nullify Garcia's waiver. <u>See</u> Response at 6.

Finally, the United States asserts that, under the totality of the circumstances, Garcia's waiver was voluntary. <u>See</u> Response at 6. Namely, the United States argues that the waiver was voluntary, because: (i) Garcia was forty years old with "numerous previous contacts with law enforcement"; (ii) he was not handcuffed; (iii) he was provided water; (iv) the agents never threatened Garcia; (v) the "nature of the interview . . . indicate[s] that [Garcia] knew what he was talking about, and how not to incriminate himself"; (vi) Sainato gave Garcia a <u>Miranda</u> warning, which Garcia acknowledged with a signed affirmation; and (vii) the interview was "conversational and respectful." Response at 6-7. The United States concludes that Garcia's statements "were freely given" and requests that the Court deny the Motion to Suppress. <u>See</u> Response at 7.

**3.      The Reply.**

Garcia replies. <u>See</u> Defendant's Reply to United States Sealed Response to Motion to Suppress Statement By Defendant Obtained in Violation of <u>Miranda v. Arizona</u> & Motion to Suppress Involuntary Statements by Defendant & Request for Hearing Pursuant to 18 U.S.C. § 3501 (Doc. 226), filed April 12, 2017 (Doc. 237)("Reply"). He argues that the law-enforcement agents' intent is immaterial under <u>Seibert</u>, and, thus, whether Sainato and Lerner

- 17 -

intended to delay the <u>Miranda</u> warning given does not matter. <u>See</u> Reply at 1-2. Garcia contends that the relevant inquiry is the "defendant's subjective experience" when receiving the <u>Miranda</u> warning, <u>i.e.</u>, whether the delayed <u>Miranda</u> warning signals to "the suspect that he had a real choice about giving an admissible statement." Reply at 2 (citing <u>Seibert</u>, 542 U.S. at 611-12).

Garcia also argues that, contrary to the United States' assertion that he did not confess anything before the <u>Miranda</u> warning, he had confessed to "his involvement with S.N.M., when and where he was admitted to the gang," "who initiated him into the gang," SNM associates' names and nicknames, and that he was present during a murder. Reply at 3. Garcia also asserts that the interrogation after the <u>Miranda</u> warning overlapped those subjects as the interview covered "numerous gang-related incidents." Reply at 3. Garcia also contends that the Court should suppress Garcia's statements under <u>Seibert</u>, because "there was no gap between the pre- and post-Miranda interrogations," "Garcia was not moved to a different location," and "the same personnel continued the interrogation post-Miranda." Reply at 3 (citing <u>Seibert</u>, 542 at 615).

Garcia next argues that the United States impermissibly shifted the burden to Garcia when it argued that Garcia had no issue with the lack of an initial <u>Miranda</u> warning. <u>See</u> Reply at 3. He avers that the Supreme Court of the United States of America's concern in <u>Seibert</u> is that ordinary people "would be disinclined to remain silent once interrogation was already under way." Reply at 4 (citing <u>Seibert</u>, 542 U.S. at 613). Garcia asserts that, accordingly, he has no duty to "object to defective Miranda warnings in order to retain" his rights. Reply at 4. Garcia concludes that the Court should suppress Garcia's statements under <u>Siebert</u> and disregard the United States' arguments to the contrary. <u>See</u> Reply at 4.

4.    **The May 4, 2017, Hearing**.

The Court held a hearing on May 4, 2017.  See May Tr. at 141:3 (Adams).  Garcia argued that the Court should suppress the entire interrogation, because Seibert's five factors weigh toward suppressing the statements.  See May Tr. at 141:3-4 (Adams)(citing Seibert, 542 U.S. at 615 (listing the five factors as: (i) the completeness and detail of the pre-Miranda interrogation; (ii) the overlapping content of the pre- and post-Miranda statements; (iii) the timing and setting of the pre- and post-Miranda statements; (iv) the continuity of police personnel; and (v) the degree to which the interrogators treated the post-Miranda statements as continuous to the pre-Miranda statements).  He argued that the pre-Miranda round of interrogation was complete and detailed, because Sainato and Lerner covered many SNM topics with Garcia.  See May Tr. at 141:9-142:7 (Adams).  He contended that the two rounds of questioning overlapped, because Sainato admitted that everything asked after the Miranda warning "had been based off the building blocks" of the first round of questioning.  May Tr. at 142:12-17 (Adams).  Garcia added that the timing, the setting, and the continuity of the police personnel weighs toward suppression, because the setting and the law-enforcement agents never changed -- both Sainato and Lerner stayed with Garcia at the parole office for the interview's entirety.  See May Tr. at 143:12-21 (Adams).  Finally, he averred that Sainato and Lerner treated the post-Miranda statements as continuous with the pre-Miranda statements, because the post-Miranda questioning immediately reverted to a pre-Miranda topic -- an SNM member nicknamed "Styx."  May Tr. at 144:6-16 (Adams).

The Court observed that Garcia's statements do not give "any sort of clean admissions on himself," but give a lot of general information about SNM.  May Tr. at 145:6-9 (Court).  It asked how the content of Garcia's statements might affect the suppression analysis.  See May Tr. at

144:25-145:18 (Court). Garcia responded that the relevant question is whether "Miranda [had] been faithfully complied with" and that the Court should not do any "guesswork on what was in somebody's state of mind." May Tr. at 145:25-146:3 (Adams). He contended that, although "it sure does look like Garcia was ready to talk," the United States "shouldn't be able to get the benefit of that by choosing how and when to work around the strict requirements of Miranda." May Tr. at 147:6-9 (Adams).

The United States then took the podium and contended that Sainato had made a good-faith mistake when he gave a late Miranda warning. See May Tr. at154:3-6 (Armijo). It added that an officer's state of mind is relevant under Seibert given the Supreme Court's emphasis in that case on the officers' intentions. See May Tr. at 154:9-16 (Armijo). The Court agreed that it appeared as if Sainato did not intend to delay the Miranda warning, but it expressed concern that Lerner behaved as if the Miranda warning was "something to be overcome rather than something to be given to assure that the statements are voluntary," and that the interrogation immediately reverted to talking about "Styx." May Tr. at 155:13-24 (Court). The United States rejoined that Garcia's voluntariness is apparent from Garcia's comment: "I can even say on the recording that I understand what happened. And everything is fine. I'm not against it. You know what I mean." May Tr. at 156:12-15 (Armijo). The United States continued that this statement demonstrates that, even if the Miranda warning had been given in the car or at the beginning of the interview, Garcia would have talked. See May Tr. at 157:4-7 (Armijo). The United States argued that Garcia's voluntariness is also apparent from his desire to continue the interview even as Sainato and Lerner tried to end it. See May Tr. at 158:2-5 (Armijo). The United States contended that Garcia's desire to tell everything is relevant under Seibert's completeness factor. See May Tr. at 158:12-14 (Armijo). It also represented that the only statements it sought to

introduce are on page 199 of the Int. Tr.,[14] which involve Garcia discussing his heroin source. See May Tr. at 164:7-25 (Armijo); supra at 14. The United States then argued that Oregon v. Elstad, 470 U.S. 298 (1985), and not Seibert, controls the case, because Sainato's failure to give the Miranda warning had been unintentional. See May Tr. at 165:9-166:8 (Armijo). See also May Tr. at 167:10-15 (Armijo)(citing United States v. Crisp, 371 F. App'x 925 (10th Cir. 2010)(unpublished), for the proposition that the officer's intentionality bears on the midstream Miranda analysis)).

Garcia rejoined that Sainato is a special agent trained to talk with a suspect before giving the Miranda warning to "find commonality" so that he can "elicit incriminating statements." Tr. at 168:2-9 (Adams). From that premise, he argues that Sainato was not acting in good-faith when he delayed the Miranda warning. See Tr. at 168:13-14 (Adams). After hearing argument, the Court was inclined to admit the statement on page 199 of the Int. Tr., because the Miranda warning was "a robust one," and because there was no connection between the first sixteen minutes of the interview and Int. Tr. at 199.[15] May Tr. at 177:13-178:5 (Court).

5.    **The Supplemental Motion.**

Garcia files a Supplemental Motion in response to testimony from Lerner that, before the interview began, Garcia said to Lerner: "My attorney is Robert Gorence." See Defendant's Supplemental Motion Regarding Suppression of Statement Obtained After Invocation of Counsel at 1-2, filed May 4, 2017 (Doc. 262)("Supp. Motion"). Garcia argues that the Court must

---

[14]At May hearing, the Motion to Suppress had not yet been incorporated into United States v. DeLeon. The Court notes that the United States represented at the hearing only what it sought to introduce at the United States v. Garcia trial and not what it sought to introduce at the United States v. DeLeon trial. Indeed, the statements from Int. Tr. at 199 about Garcia's heroin source do not appear relevant to the crimes with which Garcia has been charged in United States v. DeLeon. See Indictment at 15-16.

[15]See supra, n.14.

suppress the interview statements, because they were obtained after Garcia invoked his right to counsel under the Fifth Amendment of the Constitution of the United States of America. See Supp. Motion at 3. He contends that the totality of the circumstances demonstrate that he clearly invoked his right to counsel. See Supp. Motion at 5. He states that: (i) he was arrested in the early morning at his house; (ii) many law-enforcement officers were present; (iii) he was cuffed and placed in a marked police car; (iv) Lerner told him the FBI was going to interrogate him; and (v) in response to learning that he was going to be questioned, Garcia stated: "My attorney is Robert Gorence." Supp. Motion at 5. Garcia adds that he clearly invoked the right, because he mentioned a New Mexico lawyer by name, and Lerner knew that Mr. Gorence was an a New Mexico attorney. See Supp. Motion at 5-6. Garcia concludes that his invocation of his right to counsel followed by Lerner's failure to clarify and a delayed Miranda warning further militate toward suppressing Garcia's statements. See Supp. Motion at 6.[16]

**6.      Guilty Plea and United States v. DeLeon Hearing.**

On June 26, 2017, Garcia pled guilty in United States v. Garcia, No. 15-4275. See Plea Agreement ¶ 3, at 2, filed June 26, 2017 (Doc. 294). The Court ordered Garcia to give notice to the United States what motions from United States v. Garcia he wished to incorporate in United States v. DeLeon, No. 15-4268. See Transcript of Motion Proceedings at 159:7-17 (taken November 9, 2017)(Court), No. 15-4268, filed November 20, 2017 (Doc. 1457)("Nov. Tr."). The Court told the United States to inform Garcia what evidence it intended to use from United States v. Garcia in United States v. DeLeon, so as to eliminate needless motions. See Nov. Tr. at 159:18-25 (Court). The Court noted, specifically, that it did not

> want to have [Garcia] write a motion, or [the Court] write an opinion . . . and then
> the Government get there and say, [w]e don't want to use [the evidence]. . . .

---

[16]The United States did not file a response to this briefing.

> [T]he Government does need to sit down and give a hard thought to it, and say, [w]e're either going to use it or not use it.

Nov. Tr. at 159:22-160:5 (Court)(alterations added).

Garcia filed a notice to incorporate the Motion to Suppress. <u>See</u> Notice per Court's Ruling of Incorporation of Motions and Related Transcripts from 15-CR-4275 Needing the Court's Decision at 1, No. 15-4268, filed November 28, 2017 (Doc. 1486); Transcript of Motion Proceedings at 272:4-7 (taken December 18, 2017)(Adams), No. 15-4268, filed January 2, 2018 (Doc. 1600). The United States has not filed a response or signaled what evidence it intends to use in <u>United States v. DeLeon</u> from the interview transcript.

The Court held a hearing on December 19, 2017 in <u>United States v. DeLeon</u>, in which it heard additional argument on the Motion to Suppress. <u>See</u> Transcript of Motion Proceeding (taken December 19, 2017), No. 15-4268, filed January 4, 2018 (Doc. 1608)("Dec. Tr."). Garcia argued that the Court should view the Motion to Suppress differently for <u>United States v. DeLeon</u> than it had for <u>United States v. Garcia</u>. <u>See</u> Dec. Tr. at 4:23-24 (Adams). He reasoned that the pre-<u>Miranda</u> statements heavily concerned SNM and, unlike in <u>United States v. Garcia</u> where the United States wanted to introduce only select testimony on drug crimes, the United States here would likely want to introduce Garcia's post-<u>Miranda</u> statements concerning SNM. <u>See</u> Dec. Tr. at 4:24-5:3 (Adams). The Court stated that "the statement after the Miranda warnings are admissible; the ones before are not admissible." Dec. Tr. at 5:15-17 (Court).

## <u>RELEVANT LAW REGARDING</u> <u>MIRANDA</u> <u>RIGHTS</u>

Law enforcement officials must give the <u>Miranda</u> warnings to a person subject to "custodial interrogation." <u>United States v. Hudson</u>, 210 F.3d 1184, 1190 (10th Cir. 2000)(citing <u>Miranda v. Arizona</u>, 384 U.S. at 444)(internal quotations omitted). A person is in custody if "his freedom of action is curtailed to a degree associated with formal arrest." <u>United States v.</u>

Hudson, 210 F.3d at 1190 (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). The court

must examine "whether a reasonable [person] in the suspect's position would have understood

his situation . . . as the functional equivalent of formal arrest." United States v. Hudson, 210

F.3d at 1190 (brackets in original)(internal quotations and citations omitted).

### 1. **Custodial Interrogation.**

A suspect cannot invoke his Miranda rights anticipatorily; Miranda's protections do not

trigger until the suspect is in a custodial interrogation context. See McNeil v. Wisconsin, 501

U.S. 171, 182 n.3 (1991); United States v. Cook, 599 F.3d 1208, 1214 (10th Cir. 2010)("[I]n

order to implicate *Miranda* and *Edwards*, there must be a custodial interrogation."); Appleby v.

Cline, __ F. App'x __, 2017 WL 4310267, at *2 (10th Cir. 2017)(unpublished).[17] "By custodial

interrogation, we mean questioning initiated by law enforcement officers after a person has been

taken into custody or otherwise deprived of his freedom of action in any significant way."

Berkemer v. McCarty, 468 U.S. 420, 428 (1984)(quoting Miranda, 384 U.S. at 444). There are

"[t]wo discrete inquiries . . . essential to the determination" of custody: "first, what were the

circumstances surrounding the interrogation; and second, given those circumstances, would a

reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."

J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011). See United States v. Erving L., 147 F.3d

---

[17]Appleby v. Cline is an unpublished Tenth Circuit opinion, but the Court can rely on an
unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case
before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but
may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit,
unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not
favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a
material issue in a case and would assist the court in its disposition, we allow a citation to that
decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes
that Appleby v. Cline, United States v. Sierra-Estrada, United States v. Sanchez-Gallegos, and
United States v. Crisp have persuasive value with respect to a material issue, and will assist the
Court in its preparation of this Memorandum Opinion and Order.

1240, 1245 (10th Cir. 1998). "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." J.D.B. v. North Carolina, 564 U.S. at 270. A suspect's Miranda rights may trigger before a law-enforcement officer gives a Miranda warning. See United States v. Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998).

What amounts to custody, however, is only one half of the inquiry. See United States v. Cash, 733 F.3d 1264, 1277 (10th Cir. 2013)("The fact that [a defendant is] in custody, however, does not automatically render [an] exchange an interrogation.")(alterations in original). A suspect in custody may not invoke his Miranda rights if he is not also interrogated. See Rhode Island v. Innis, 446 U.S. 291, 293, 300 (1980). Interrogation does not require "express questioning of a defendant while in custody." Rhode Island v. Innis, 446 U.S. at 298. The Supreme Court explained that Miranda was concerned with more than just questioning, but also the "interrogation environment," which implicated practices that "did not involve express questioning." Rhode Island v. Innis, 446 U.S. at 299. "For example, one of the practices discussed in *Miranda* was the use of line-ups in which a coached witness would pick the defendant as the perpetrator. This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation." 446 U.S. at 299. "A variation on this theme discussed in *Miranda* was the so-called reverse line-up in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution." 446 U.S. at 299. Accordingly, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally

attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301. See United States v. Cash, 733 F.3d at 1277 ("[I]nterrogation extends *only* to words or actions that the officers should have known were reasonably likely to elicit an incriminating response.")(citing Fox v. Ward, 200 F.3d 1286, 1298 (10th Cir. 2000)(emphasis in United States v. Cash)). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Rhode Island v. Innis, 446 U.S. at 301. See United States v. Yepa, 862 F.3d 1252, 1257 (10th Cir. 2017).

"Conduct normally attendant to arrest and custody" is "not the functional equivalent of interrogation." Fox v. Ward, 200 F.3d 1286, 1298 (10th Cir. 2000)(concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their business cards did not constitute interrogation). The United States Court of Appeals for the Tenth Circuit has concluded, however, that interrogation "includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent." United States v. Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998)(citing United States v. Kelsey, 951 F.2d 1196, 1198-99 (10th Cir. 1991)("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")). See Connecticut v. Barrett, 479 U.S. 523, 231 (1987)("[C]ustodial interrogation is inherently coercive and that a defendant must receive detailed warnings that he or she has the rights to remain silent to receive assistance of counsel before and during questioning."). The Tenth Circuit, however, has since walked back from United States v. Bautista and United States v. Kelsey. In United States v. Cash, a suspect was handcuffed and placed in the back of a squad car after a scuffle with the police, but that did not amount to an interrogation even though questioning was imminent. United States v. Cash,

733 F.3d at 1278-79. Rather, the Tenth Circuit focused its inquiry on specific exchanges between the suspect and officers to determine whether the officer's questions were "reasonably likely to elicit an incriminating response" as Rhode Island v. Innis commands. United States v. Cash, 733 F.3d at 1278-79 (quoting Rhode Island v. Innis, 446 U.S. at 301). See United States v. Yepa, 862 F.3d at 1258-61; United States v. Benard, 680 F.3d 1206, 1212 (10th Cir. 2012).

The Court has considered custodial interrogation on several occasions. In United States v. Romero, 743 F. Supp. 2d 1281 (D.N.M. 2010)(Browning, J.), the Court applied Rhode Island v. Innis and concluded that a suspect was subjected to interrogation, but was not in custody, so Miranda did not apply. See United States v. Romero, 743 F. Supp. 2d at 1332. The Court determined that a suspect was interrogated, because officers asked the suspect about his whereabouts on a Friday night, and the officer knew that the suspect was the last person to see the victim alive on Friday. See United States v. Romero, 743 F. Supp. 2d at 1332. The Court concluded, however, that the suspect was not in custody, because there was "nothing excessively coercive . . . about the circumstances of the questioning." 743 F. Supp. 2d at 1334. To be sure, the suspect sat in a police vehicle while questioned, but: (i) he sat in the front seat; (ii) the car's back door was open; (iii) both windows were rolled down; (iv) there was no prolonged accusatory questions; (v) the suspect was not taken to a police station; (vi) law enforcement officers did not display their weapons; and (vii) the officers never touched the suspect. See 743 F. Supp. 2d at 1334-35. See also United States v. Rodriguez, 836 F. Supp. 2d 1258, 1292-94 (D.N.M. 2011)(Browning, J.)(concluding that there was no custodial interrogation).

**2.    Miranda waiver.**

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently." United States v. Burson, 531 F.3d 1254, 1256 (10th

Cir. 2008)(citations omitted). An express statement is not required; the waiver can be inferred from the defendant's actions and words. See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir. 2006)(citation omitted). "Whether this standard is met depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." United States v. Burson, 531 F.3d at 1256. The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurred. See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11. The Tenth Circuit has noted that this standard incorporates two distinct requirements:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(citations omitted). In determining whether a waiver of rights was knowing and intelligent, the Tenth Circuit employs a totality of the circumstances approach. See United States v. Burson, 531 F.3d at 1256-57 (citation omitted). "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010)(citations omitted). A "state of intoxication does not automatically render a statement involuntary." United States v. Smith, 606 F.3d at 1276. "Rather the test is whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession." United States v. Smith, 606 F.3d at 1276-77 (brackets in original).

In <u>United States v. Tafoya</u>, 399 F. Supp. 2d 1227 (D.N.M. 2005)(Browning, J.) the Court considered whether a suspect had knowingly waived his <u>Miranda</u> rights after he was given the warning and responded to the officer's questioning related to the investigation.  <u>See</u> 399 F. Supp. 2d at 1238.  Although the suspect was "emotional" during the questioning, he "gave clear and appropriate answers" to the questions asked of him.  399 F. Supp. at 1238-39.  On those facts, the Court concluded that the suspect had "made voluntary" statements.  399 F. Supp. at 1239.

> **3.      <u>Requests for an Attorney</u>.**

The Fifth and Fourteenth Amendments provide the accused a "right to have counsel present during custodial interrogation."  <u>Edwards v. Arizona</u>, 451 U.S. 477, 481 (1981).   In <u>Miranda v. Arizona</u>, the Supreme Court held:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.  At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.  If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.   The Supreme Court expanded on that principle in <u>Edwards v. Arizona</u>, concluding that, once an individual, subject to custodial interrogation, expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  <u>Edwards v. Arizona</u>, 451 U.S. at 484-85.  <u>See</u> <u>id.</u> at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."); <u>Davis v. United States</u>, 512 U.S. 452, 458 (1994)("[I]f a suspect requests counsel at any time during the interview, he is not subject to

further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.").  The Tenth Circuit has held that <u>Edwards</u> applies -- and a suspect can invoke a right to counsel -- before the officers have issued a <u>Miranda</u> warning.  <u>See</u> <u>United States v. Kelsey</u>, 951 F.2d at 1199 ("It is clear from the exchange between Kelsey and the police . . . that the police intended to question Kelsey at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning.").

This rule amounts to a "second layer" of protection for the accused who has invoked his right to an attorney in that further communication with law enforcement does not mean that he waived his right to an attorney, unless he initiates the conversation.  <u>Maryland v. Shatzer</u>, 559 U.S. 98, 104 (2010).  "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  <u>Maryland v. Shatzer</u>, 559 U.S. at 104 (quoting <u>Edwards v. Arizona</u>, 451 U.S. at 484-85).

> The rationale of *Edwards* is that once a suspect indicates that he is not capable of undergoing questioning without advice of counsel, any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures and not the purely voluntary choice of the suspect.

<u>Maryland v. Shatzer</u>, 559 U.S. at 104-05 (citations omitted).  Accordingly, "a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested" counsel.  <u>Maryland v. Shatzer</u>, 559 U.S. at 105.  The Supreme Court has noted, however, that the "*Edwards* rule is not a constitutional mandate, but judicially prescribed prophylaxis."  <u>Maryland v. Shatzer</u>, 559 U.S. at 105.[18]  A break in custody of fourteen days or

---

[18]<u>But</u> <u>see</u> <u>Dickerson v. United States</u>, 530 U.S. 428 (2000); <u>infra</u> n.19.

more ends the Edwards v. Arizona rule that a subsequent attempt to obtain a Miranda waiver is ineffective when the suspect initially requested counsel. See Maryland v. Shatzer, 559 U.S. at 110.

The request for counsel must be clear and unequivocal. See Davis v. United States, 512 U.S. 452, 459 (1994). To be sure, "a suspect need not speak with the discrimination of an Oxford don," but "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" Davis v. United States, 512 U.S. at 459 (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)). The applicability of the rule that law enforcement cease custodial interrogation upon a clear request for counsel "requires courts to 'determine whether the accused actually invoked his right to counsel.'" Davis v. United States, 512 U.S. at 458 (citations omitted). An individual's "ambiguous" or "equivocal" references to an attorney, regarding which "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning. Davis v. United States, 512 U.S. at 459 (emphasis in original). The Supreme Court later explained: "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" Berghuis v. Thompkins, 560 U.S. 370, 382 (quoting Davis v. United States, at 512 U.S. at 461). "Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity." Berghuis v. Thompkins, 560 U.S. at 382.

The Supreme Court held in <u>Davis v. United States</u> that a defendant's statement to law enforcement agents that "[m]aybe I should talk to a lawyer" was not a clear and unequivocal request for counsel. 512 U.S. at 462. <u>See</u> <u>Maryland v. Shatzer</u>, 559 U.S. at 112 (noting that a defendant's statement that "he would not talk about this case without having an attorney present" satisfactorily invoked the defendant's right to an attorney); <u>United States v. Zamora</u>, 222 F.3d 756, 765 (10th Cir. 2000)(holding that "I might want to talk to my attorney" is ambiguous, so did not invoke right to counsel. In <u>United States v. Santistevan</u>, 701 F.3d 1289 (10th Cir. 2012), the Tenth Circuit held that a letter a defendant handed to a law-enforcement agent, which read "Mr. Santistevan does not wish to speak with you without counsel" is "an unambiguous invocation of the right to counsel." <u>United States v. Santistevan</u>, 701 F.3d at 1092-93. Although the defendant agreed to speak with law enforcement without his attorney present almost immediately after handing over the letter, the Tenth Circuit determined that, "once the suspect unambiguously invokes the right to counsel -- as Mr. Santistevan did here by giving the letter to the agent -- all questioning must stop." <u>United States v. Santistevan</u>, 701 F.3d at 1293. In <u>United States v. Lux</u>, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant did not make an unambiguous request for counsel when she asked "how long it would take" if she wanted a lawyer and if she "would have to stay in jail" while she waited. <u>United States v. Lux</u>, 905 F.2d at 1382. <u>See</u> <u>Valdez v. Ward</u>, 219 F.3d 1222, 1232-33 (10th Cir. 2000)(holding that a non-native English speaker's statement, in response to whether he understood his <u>Miranda</u> rights, that "Yes, I understand a little bit and I sign it because I understand something about a lawyer and he want to ask me questions and that's what I'm looking for a lawyer" [sic] is an ambiguous request for counsel); <u>Mitchell v. Gibson</u>, 262 F.3d 1036, 1056 (10th Cir. 2001)("Even construed most favorably to Mr. Mitchell, his statement

asking police whether he needed an attorney is not, in light of the circumstances, a sufficiently clear request for counsel."); United States v. Sierra-Estrada, 248 F. App'x 973, 981 (10th Cir. 2007)(unpublished)(collecting appellate court cases). The Court has ruled previously that a suspect's question about "whether she needed an attorney" did not constitute a clear and unequivocal request sufficient to invoke a right to counsel. United States v. Alfaro, No. 08-0784, 2008 WL 5992268, at *13 (D.N.M. December 17, 2008)(Browning, J.). See United States v. Martinez, 2006 WL 4079686, at *13 (D.N.M. November 21, 2006)(Browning, J.)(ruling that "an inquiry whether he might need a lawyer . . . was not an unequivocal assertion of his right to counsel.").

      **4.**         **Midstream Miranda Warnings.**

The Supreme Court first considered midstream Miranda warnings in Oregon v. Elstad, 470 U.S. 298 (1985)("Elstad") -- a home-burglary case. In Elstad, a witness to the burglary implicated an 18-year-old neighbor -- Michael Elstad -- and, on that information, Oregon detectives confronted the teenager in his parent's home. See Elstad, 470 U.S. at 300. Without issuing a Miranda warning, detectives briefly questioned Elstad in his parent's living room, and Elstad admitted that he was involved in the burglary. See Elstad, 470 U.S. at 301. The detectives then escorted Elstad to the sheriff's headquarters and read him his Miranda rights. 470 U.S. at 301. Elstad waived them and gave a full written confession. See 470 U.S. at 301-02.

On appeal, Elstad argued that his "confession was tainted by the earlier failure of the police to provide *Miranda* warnings," Elstad, 470 U.S. at 305, and, drawing on the Fourth Amendment's fruit-of-the-poisonous-tree doctrine, see Wong Sun v. United States, 371 U.S. 471 (1963), he contended that the confession "must be excluded," Elstad, 470 U.S. at 305. The Supreme Court disagreed with Elstad, concluding that "procedural *Miranda* violation[s] differ[]

in significant respects from" Fourth Amendment violations.  Elstad, 470 U.S. at 306 (alterations

added).  It explained that, unlike a Fourth Amendment search-and-seizure violation, a Miranda

violation does not necessarily mean that there was a constitutional violation.  See Elstad, 470

U.S. at 306-07.  The Fifth Amendment prohibits the use of compelled testimony; "[f]ailure to

administer *Miranda* warnings," on the other hand, "creates a presumption of compulsion," but

"unwarned statements that are otherwise voluntary" are nevertheless barred under Miranda.

Elstad, 470 U.S. at 306-07. Thus, the "*Miranda* exclusionary rule" is prophylactic, and "sweeps

more broadly than the Fifth Amendment itself."  Elstad, 470 U.S. at 306.

That Miranda sweeps more broadly than the Fifth Amendment means that, unlike a

Fourth Amendment violation, a Miranda violation does not necessarily require a confession's

exclusion. [19]   See 470 U.S. at 307; Sanchez-Llamas v. Oregon, 548 U.S. at 348 ("We have

---

[19]There is tension in this reasoning and with the Supreme Court's later determination in
Dickerson v. United States, 530 U.S. 428 (2000)("Dickerson") that Miranda is a constitutional
rule.  See Dickerson, 530 U.S. at 437-38, 441.  In Dickerson, although conceding that "we have
repeatedly referred to the *Miranda* warnings as 'prophylactic,' and 'not themselves rights
protected by the Constitution,'" Dickerson, 530 U.S. at 437-38, the Supreme Court concluded
that "*Miranda* is a constitutional decision," because (i) it had consistently applied Miranda to
state court decisions and (ii) Miranda had invited legislative action "to protect the constitutional
right against coerced self-incrimination," Dickerson, 530 U.S. at 438-40.  If Miranda is a
constitutional rule, however, it is hard to see how it can "sweep[] more broadly than the Fifth
Amendment itself."  Elstad, 470 U.S. at 306.  It is possible that the Supreme Court meant that
Miranda implicated additional constitutional amendments, such as the Fourteenth, but the
statement's context in Elstad suggests that the Supreme Court meant that Miranda's exclusionary
rule arose from judicial rulemaking, not from some other Amendment beyond the Fifth.  See
Elstad, 470 U.S. at 305 ("Respondent's contention that his confession was tainted by the earlier
failure of the police to provide *Miranda* warnings and must be excluded as 'fruit of the
poisonous tree' assumes the existence of a constitutional violation."); Elstad, 470 U.S at 307
("*Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no
identifiable constitutional harm.").  The Supreme Court, in expressly recognizing this tension,
noted that Elstad "does not prove that *Miranda* is a nonconstitutional decision, but simply
recognizes the fact that unreasonable searches under the Fourth Amendment are different from
unwarned interrogation under the Fifth Amendment."  Dickerson v. United States, 530 U.S. at
441.  But see id. at 454 (Scalia, J., dissenting)("The proposition that failure to comply with
*Miranda's* rules does not establish a constitutional violation was central to the *holdings* of

- 34 -

[*Michigan v.*] *Tucker*, [530 U.S. 428 (2000)], [*Oregon v.*] *Hass*, [420 U.S. 714 (1975)], [*New York v.*] *Quarles*, [467 U.S. 649 (1984)], and *Elstad*.")(emphasis in original)(alterations added).

Because Elstad's reasoning to exclude fruit-of-the-poisonous-tree evidence rested, in large part, on Miranda being a nonconstitutional rule, that Dickerson v. United States determined that Miranda is a constitutional rule reopened the question why fruit-of-the-poisonous-tree evidence is not excluded after a procedurally tainted Miranda warning. See United States v. Patane, 542 U.S. 630 (2004)("Patane")(plurality op.)("Based on its understanding of *Dickerson*, the Court of Appeals rejected the post-*Dickerson* views of the Third and Fourth Circuits that the fruits doctrine does not apply to *Miranda* violations."). See also Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the exclusionary rule primarily to deter constitutional violations.").

The Supreme Court attempted to resolve this tension in Patane, but a divided court produced no controlling opinion. See Patane, 542 U.S. at 635-36. Justices Scalia, Thomas, and Chief Justice Rehnquist determined that Miranda was a prophylactic rule, and that admitting "fruits" evidence from a voluntary statement did not implicate the Fifth Amendment's Self-Incrimination clause. Patane, 542 U.S. at 636. The plurality reasoned that, even taking Dickerson v. United States' holding to heart that Miranda is a constitutional rule, there must be a close fit between the constitutional violation and the remedy. See Patane, 542 U.S. at 643. It concluded that admitting nontestimonial fruits of a voluntary statement do not implicate the Self-Incrimination clause, so there is no fit between the Miranda violation and the exclusionary remedy. Patane, 542 U.S. at 643 ("The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial."). In so concluding, the three justices in the plurality reaffirmed that Elstad's reasoning was sound. Patane, 542 U.S. at 639-40. Justices O'Connor and Kennedy concurred in the judgment and concurred in concluding that Elstad is still good law after Dickerson v. United States. See Patane, 542 U.S. at 645 (Kennedy, J., concurring). The two justices did not, however, expressly adopt the constitutional "fit" analysis that the plurality deployed. Patane, 542 U.S. at 645. They concluded that admitting nontestimonial fruits from a voluntary statement "does not run the risk of admitting into trial an accused's coerced incriminating statements against himself." Patane, 542 U.S. at 645 (Kennedy, J., concurring). Instead of concluding that such a remedy would not fit the constitutional violation, however, they concluded that excluding such evidence would not serve the police "deterrence rationale" infusing Miranda. Patane, 542 U.S. at 645 (Kennedy, J., concurring). The concurrence did not comment on Elstad's rationale that Miranda did not justify excluding "fruits" evidence, because, unlike the Fourth Amendment, Miranda is not a constitutional rule.

Elstad's constitutional reasoning, thus, may no longer be good law, but the trustworthiness and deterrence rationales for it may be. See Elstad, 470 U.S. at 308. Moreover, despite Dickerson v. United States' suggestion that "fruits" evidence may need to be excluded as Miranda is a constitutional rule, five justices eschewed that suggestion in Patane. Patane, 542 U.S. at 643, 645. Accordingly, the Court concludes that a procedural Miranda violation does not require the Court to exclude nontestimonial evidence from a voluntary statement based on a fruit-of-the-poisonous-tree theory. See Wong Sun v. United States, 371 U.S. at 471; United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006).

Furthermore, the Court would join the Justices who have noted that Miranda is not properly rooted or found in the Constitution, but instead is the product of the Supreme Court's

applied the exclusionary rule primarily to deter constitutional violations."). Indeed, the prosecution may still use a confession obtained in violation of <u>Miranda</u> for impeachment purposes. <u>See</u> 470 U.S. at 307. Moreover, the Supreme Court reasoned that categorically barring a confession after a midstream <u>Miranda</u> warning "undercuts the twin rationales" of the prophylactic <u>Miranda</u> rule -- trustworthiness and deterrence. 470 U.S. at 308. <u>See</u> <u>Dickerson v. United States</u>, 530 U.S. at 433 ("The roots of this test developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy.").

> A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt . . . but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given to it; and therefore it is rejected.

<u>King v. Warickshall</u>, 1 Leach 262, 263-64, 168 Eng. Rep. 234, 235 (K.B. 1783). If the post-<u>Miranda</u> confession is otherwise knowing and voluntary, its trustworthiness is not in doubt. <u>See</u> <u>Elstad</u>, 470 U.S. at 308. The deterrence rationale likewise loses force when the officers acted in good faith compliance with <u>Miranda</u>. <u>See</u> <u>Elstad</u>, 470 U.S. at 308 (citing <u>Michigan v. Tucker</u>, 417 U.S. at 447-48). Accordingly, the Supreme Court held that, once the <u>Miranda</u> warning is made, "the admissibility of any subsequent statement should turn . . . solely on whether [the statement] is knowingly and voluntarily made." <u>Elstad</u>, 470 U.S. at 309. <u>See</u> <u>id.</u> at 318 ("The relevant inquiry is whether, in fact, the second statement is voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct.").

---

power to provide prophylactic rules. <u>See</u> <u>Maryland v. Shatzer</u>, 559 U.S. at 106. It may not be a bad rule in that it has -- with its bright-line application -- made a lot of otherwise fuzzy confessions valuable and protected police in their work, but its constitutional and judicial underpinnings are shaky if not non-existent.

Extrapolating from that test, the Supreme Court concluded that Elstad's pre- and post-Miranda confessions were voluntary, so admissible. See Elstad, 470 U.S. at 314-15. It noted that, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." Elstad, 470 U.S. at 310. However, where the initial confession is voluntary, "a break in the stream of events" is not needed for the second confession to be admissible. Elstad, 470 U.S. at 310. Rather, the Miranda warning "serves to cure the condition that rendered the unwarned statement inadmissible." Elstad, 470 U.S. at 311.

In Elstad, the Supreme Court reasoned that the initial confession "took place at midday" in Elstad's living room with his mother "a few steps away," so it was voluntary. Elstad, 470 U.S. at 315. With no additional facts demonstrating that the second confession, post-Miranda was elicited under coercive conditions, the Supreme Court deemed it admissible. See 470 U.S. at 314. That Elstad had "let the cat out of the bag by confessing" with his first statement in no way created a "presumption of compulsion" for the second statement. 470 U.S. at 311, 314. The Supreme Court noted that there may be a "psychological impact of a voluntary disclosure of a guilty secret," but such disclosure, as a matter of law, does not qualify "as state compulsion or compromises the voluntariness of a subsequent informed waiver." 470 U.S. at 312.

The Supreme Court next considered midstream-Miranda warnings in Seibert and issued only a plurality opinion. See Seibert, 542 U.S. at 603-05.[20] In Seibert, a young boy with

---

[20]Justice Souter announced the Court's judgment and delivered an opinion joined by Justices Stevens, Ginsburg, and Breyer. Seibert, 542 U.S. at 603. Justice Breyer filed a concurrence, and Justice Kennedy concurred in the judgment. 542 U.S. at 617-18. Justice O'Connor, joined by Chief Justice Rehnquist and Justices Scalia and Thomas, dissented. 542 U.S. at 622.

cerebral palsy died in his sleep, and his mother feared charges of neglect, because the boy's body was covered in bedsores.  See Seibert, 542 U.S. at 604.  The mother, along with two of her remaining sons and family friends, conspired to conceal the evidence of neglect by burning the family's mobile home with the boy's dead body in it.  See 542 U.S. at 604.  To avoid the appearance that they had left the boy unattended, they arranged for Donald Rector, a mentally ill teenager living with the family, to remain in the mobile home while they set fire to it.  See 542 U.S. at 604.  The conspirators executed their plan, and Rector died in the fire.  See 542 U.S. at 604.

Missouri officers subsequently arrested the mother.  See Seibert, 542 U.S. at 604.  Officer Kevin Clinton refrained from issuing her a Miranda warning on instructions from police headquarters.  See 542 U.S. at 604.  Another officer, Richard Hanrahan, questioned her at the police station for thirty-forty minutes without a Miranda warning, and she eventually admitted that Rector "was meant to die in the fire."  542 U.S. at 605.  After a twenty minute break, Hanrahan issued a Miranda warning, obtained a signed waiver of rights, and secured the same confession with a similar line of questioning.  See Seibert, 542 U.S. at 605.  According to Hanrahan, he consciously decided to withhold the Miranda warning in accordance with a sanctioned interrogation technique that he had been taught: "question first, then give warnings, and then repeat the question until I get the answer that she's already provided once."  542 U.S. at 605-06.

On appeal, the Supreme Court noted that Hanrahan's tactic of question first, Mirandize later, was not confined to Missouri.  See 542 U.S. at 609.  It further noted that such a tactic was at odds with Miranda's purpose; Miranda sought to ensure that individuals made a "free and rational choice" with full knowledge of their constitutional rights before speaking with officers,

whereas "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." Seibert, 542 U.S. at 611. The plurality continued:

> [I]t is likely that that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. . . . Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. . . . What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silent being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

Seibert, 542 U.S. at 613-14 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)). But see Seibert, 542 U.S. at 627 (O'Connor, J., dissenting)(critiquing these statements as adopting the "cat out of the bag" theory the Supreme Court had rejected in Elstad). Accordingly, the plurality held that "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warning could function effectively as *Miranda* requires." Seibert, 542 U.S. at 611-12.

The plurality concluded that the following factors bear on whether a midstream Miranda warning could be effective:

> [(i)] the completeness and detail of the questions and answers in the first round of interrogation, [(ii)] the overlapping content of the two statements, [(iii)] the timing and setting of the first and second, [(iv)] the continuity of police personnel, and [(v)] the degree to which the interrogator's questions treated the second round as continuous with the first.

Seibert, 542 U.S. at 615. In its analysis, the plurality added another factor: whether officers advise the suspect that the pre-Miranda confession could not be used against him. See 542 U.S.

at 616 n.7.  Conspicuously absent from those factors is the officer's intent, but the plurality noted that "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work."  542 U.S. at 616 n.6. The plurality concluded that the midstream <u>Miranda</u> warning was ineffective, because the pre- and post-<u>Miranda</u> questioning occurred in the same location, the post-<u>Miranda</u> phase occurred only twenty minutes after the pre-<u>Miranda</u> phase, the officers treated the two phases of questioning as continuous, and the pre-<u>Miranda</u> phase left "little, if anything, of incriminating potential left unsaid."  <u>Seibert</u>, 542 U.S. at 616-17.

In so holding, the plurality contrasted <u>Seibert</u> with <u>Elstad</u> and concluded that the officer's failure to warn in <u>Elstad</u> was a "good faith *Miranda* mistake," and that "any causal connection between the first and second [admissions] to the police was 'speculative and attenuated.'" <u>Seibert</u>, 542 U.S. at 615 (quoting <u>Elstad</u>, 470 U.S. at 313).  "In *Elstad*, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home," because a reasonable person "could have seen the station house questioning as a new and distinct experience."  <u>Seibert</u>, 542 U.S. at 615. Moreover, the police station interrogation went "well beyond the scope of the laconic prior admission" in the suspect's living room.  542 U.S. at 615.

Justice Breyer concurred, noting that, "[i]n my view, the following simple rule should apply to the two-stage interrogation technique: Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith."  <u>Seibert</u>, 542 U.S. at 617 (Breyer, J., concurring).   He joined "the plurality's opinion in full," however, because he

believed that "the plurality's approach in practice will function as a 'fruits' test." Seibert, 542 U.S. at 618 (Breyer, J., concurring).

Justice Kennedy joined the judgment, but concurred in the opinion and adopted a different test. 542 U.S at 622 (Kennedy, J., concurring). First, he extrapolated a general principle from the Supreme Court's Miranda cases: "Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." Seibert, 542 U.S. at 618-19 (Kennedy, J., concurring)(citing United States v. Patane, 542 U.S. at 630; Elstad, 470 U.S. at 298; New York v. Quarles, 467 U.S. at 649; Harris v. New York, 401 U.S. at 222). From that general principal, he concluded that an officer's deliberate intent to withhold a Miranda warning in an effort to obtain a confession without informing a suspect of his rights "distorts the meaning of *Miranda* and furthers no legitimate countervailing interest." 542 U.S. at 621 (Kennedy, J., concurring). He disagreed with the plurality, however, because the test the plurality articulated "cuts too broadly." 542 U.S. at 622 (Kennedy, J., concurring).

> *Miranda's* clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.

542 U.S. at 622 (Kennedy, J., concurring). Accordingly, he articulated the following test:

> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

542 U.S at 622 (Kennedy, J., concurring).[21]

Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas, dissented.  See Seibert, 542 U.S. at 622 (O'Connor, J., dissenting).  The dissenting justices concluded that Elstad's voluntary inquiry should control, and not a multi-factor balancing test or a subjective-intent test.  See 542 U.S. at 622-23, 628 (O'Connor, J., dissenting).  According to those justices, a test focusing on the officer's subjective intent missed the mark, because "[f]reedom from compulsion lies at the heart of the Fifth Amendment," so the officer's state of mind is irrelevant.  542 U.S. at 624-25 (O'Connor J., dissenting)("Thoughts kept inside a police officer's head cannot affect [the suspect's] experience.").  The plurality's approach, on the other hand, was defective, because it adopted the "cat out of the bag theory" that the Supreme Court had rejected in Elstad.  542 U.S. at 627 (O'Connor, J., dissenting).  The dissent noted that there are psychological effects on a suspect who confesses pre-Miranda and then endures questioning on the same subjects post-Miranda, but the Supreme Court had "refused to endo[w] those psychological effects with constitutional implications" in Elstad.  542 U.S. at 627 (O'Connor, J., concurring)(alteration in original).  The dissent explained that to adopt that approach "would effectively immuniz[e] a suspect to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver, an immunity that comes at a high cost to legitimate law enforcement activity."  542 U.S. at 627 (O'Connor, J. dissenting)(alteration in original). Accordingly, the dissent would have ordered a remand for the state court to determine whether the statements were voluntarily made.  See 542 U.S. at 628 (O'Connor, J. dissenting).

No published Tenth Circuit opinion has determined what opinion from Seibert is

---

[21]The Supreme Court later applied Seibert in a per curiam review of a habeas petition, but it did not resolve which test was controlling as it applied both the plurality's factors and factors which Justice Kennedy's concurrence articulated.  See Bobby v. Dixon, 565 U.S. 23, 30-32 (2011)(per curiam).

controlling.  In United States v. Carrizales-Toledo, 454 F.3d 1142 (10th Cir. 2006), the Tenth

Circuit considered the issue at length, but then declined to decide it.  See 454 F.3d at 1151.  It

recognized that the rule from Marks v. United States, 430 U.S. 188 (1977) ordinarily dictates that

the Supreme Court's holding "may be viewed as that position taken by those Members who

concurred in the judgments on the narrowest grounds."  United States v. Carrizales-Toledo, 454

F.3d at 1151 (citing Marks v. United States, 430 U.S. at 193).  The Tenth Circuit noted, however,

that "the Marks rule produces a determinate holding 'only when one opinion is a logical subset

of other, broader opinions'" and that "[w]e do not apply Marks when the various opinions

supporting the Court's decision are mutually exclusive."  United States v. Carrizales-Toledo,

454 U.S. at 1151 (quoting King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991)(en banc)).

"Determining the proper application of the Marks rule to Siebert is not easy, because arguably

Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court."

United States v. Carrizales-Toledo, 454 F.3d at 1151 (citing United States v. Rodriguez-

Preciado, 399 F.3d 1118, 1138-41 (9th Cir. 2005)(Berzon, J., dissenting in part)).  After

explaining that three of the four justices in the plurality and the four dissenters decisively

rejected Justice Kennedy's test -- what it characterized as a "subjective [test]" -- the Tenth

Circuit skirted the issue by holding that the statements at issue in United States v. Carrizales-

Toledo, "would be admissible under the tests proposed by the plurality and by the concurring

opinion."  United States v. Carrizales-Toledo, 454 F.3d at 1151 (brackets in original).

       Applying the plurality's five-factor test first, the Tenth Circuit concluded that all five

factors weighed toward admitting the statement.  See United States v. Carrizales-Toledo, 454

F.3d at 1151-52.  The first factor -- "the completeness and detail of the questions and answers in

the first round of interrogation" -- weighed toward admitting the suspect's statements, because

the initial questioning was brief and "spontaneous." 454 F.3d at 1152. The second factor -- "the overlapping content of the statements" -- weighed toward admissibility, because the suspect "provided significant new information" during the second round of questioning. 454 F.3d at 1152. The third and fourth factors -- "the timing and setting of the first and second" and "the continuity of police personnel" -- similarly balanced toward admissibility, because new agents joined the second round of questioning, and the second interview occurred at a different location, so "was a new and distinct experience." 454 F.3d at 1152. The fifth factor, which the Tenth Circuit characterized as "the most important factor" -- "the degree to which the interrogator's questions treated the second round as continuous with the first" also weighed toward admissibility, because the questioning agents never "referred back to [the suspect's] initial statements during the second interrogation." 454 F.3d at 1152.

Applying the subjective-intent test, the Tenth Circuit concluded that "the suddenness" of the suspect's initial confession, "the fact that [the suspect's] confession was in response" to the law-enforcement agent's first question, "and the open-ended nature of the question" all suggest that the agent "did not anticipate the confession." United States v. Carrizales-Toledo, 454 F.3d at 1153. The Tenth Circuit thus concluded that there was no subjective intent to circumvent Miranda. See United States v. Carrizales-Toledo, 454 F.3d at 1153. Because the agent obtained the first confession in good faith, the only remaining question is whether the initial confession was voluntary. See United States v. Carrizales-Toledo, 454 F.3d at 1153 ("Unless his initial confession was involuntary . . . [the suspect's] motion to suppress the second confession was properly denied."). The Tenth Circuit determined that the hallmarks of coercion were missing. See 454 F.3d at 1153. The suspect was a thirty-three-year-old a year shy of obtaining a chemical engineering degree, the questioning was short, and the agent did not threaten the suspect with

physical punishment.  See 454 F.3d at 1153.  Accordingly, the Tenth Circuit admitted the initial

confession.  See 454 F.3d at 1153.

The only other Tenth Circuit cases to have addressed midstream Miranda warnings are

unpublished.   See United States v. Sanchez-Gallegos, 412 F. App'x 58 (10th Cir.

2011)(unpublished); United States v. Crisp, 371 F. App'x 925 (10th Cir. 2010)(unpublished).  In

United States v. Sanchez-Gallegos, a per curiam affirmance with three concurring judges, the

Honorable David Ebel, Tenth Circuit Judge, determined that a confession obtained after a

midstream Miranda warning was admissible.  See United States v. Sanchez-Gallegos, 412 F.

App'x at 72-73 (Ebel, J., concurring).[22]  He adopted Justice Kennedy's concurrence from

Seibert.  See United States v. Sanchez-Gallegos, 412 F. App'x at 72 (Ebel, J., concurring)(noting

a lopsided circuit court split on the issue with the majority of circuits treating Justice Kennedy's

concurrence as controlling).  He characterized Justice Kennedy's test as a two-step inquiry:

(i) was the two-step interrogation technique used purposefully to undermine the Miranda

process; and (ii) if not, the post-Miranda statement is admissible if the pre-Miranda interrogation

was not coercive.  See United States v. Sanchez-Gallegos, 412 F. App'x at 72-73 (Ebel, J.,

concurring).  Judge Ebel determined that there was no evidence that the law-enforcement agents

intended to undermine Miranda with the two-step process they employed.  See 412 F. App'x at

72-73 (Ebel, J., concurring).  Instead, the record reflected that Border Patrol agents asked an

unplanned question to a driver crossing the Mexican border on legitimate suspicion that the

driver was smuggling children into the United States from Mexico.  See 412 F. App'x at 59-60

(Ebel, J., concurring).  Judge Ebel also concluded that the pre-Miranda statements were not

---

[22]In their concurrences, the Honorable Mary Briscoe, Chief Judge of the Tenth Circuit, and the Honorable Jerome Holmes, Tenth Circuit Judge, did not reach the midstream-Miranda issue.  See United States v. Sanchez-Gallegos, 412 F. App'x at 67 (Holmes, J., concurring); id. at 69 (Briscoe, J., concurring).

coerced, because the questioning, although accusatory, did not have the other hallmarks of coercion -- e.g., the suspect was not threatened with physical mistreatment, thrown in a holding cell, or questioned for a lengthy period before a Miranda warning was given. See 412 F. App'x at 71, 73 (Ebel, J., concurring).

In United States v. Crisp, the Tenth Circuit, in an opinion that Judge Holmes wrote and joined by Chief Judge Briscoe and the Honorable William Holloway, Tenth Circuit Judge, again declined to decide which test to apply to midstream Miranda warnings. See 371 F. App'x at 929. In that case, Oklahoma officers arrested a man -- Michael Crisp -- after Crisp fled on foot from his vehicle at a traffic stop. See 371 F. App'x at 926. A small bag of marijuana was later found on the route that Crisp took while fleeing from officers. See 371 F. App'x at 926. After taking Crisp to a police station, but before issuing a Miranda warning, Crisp and the officers "bantered" about "the pursuit," including "how Mr. Crisp had pulled his hamstring as he fled," Crisp's "social agenda for the evening," and how Crisp's companion in the car smelled of marijuana. 371 F. App'x at 926. Responding to an officer's question about whether Crisp's companion had smoked marijuana that evening, Crisp admitted that he was the one who had been smoking weed. See 371 F. App'x at 926. Officers then issued Miranda warnings, and Crisp waived them. See 371 F. App'x at 926. Crisp also asserted that he was presently sober and that he understood his rights, noting that "this ain't my first rodeo." 371 F. App'x at 926. The officers re-questioned Crisp about using marijuana and also secured a confession that Crisp possessed a stash of cocaine at his mother's house. See 371 F. App'x at 926-27.

The Tenth Circuit applied three tests -- the Seibert plurality's five-factor balancing test, Justice Kennedy's "intent-based" Seibert test, and the Elstad voluntary test -- and concluded that, under all three, Crisp's post-Miranda statements were admissible. 371 F. App'x at 929. Crisp's

statements were admissible under the <u>Seibert</u> plurality, because: (i) the pre-<u>Miranda</u> questions were "brief," (ii) the pre- and post-<u>Miranda</u> statements did not overlap as to the cocaine admission; and (iii) the officers did not treat the interrogations as continuous with regard to the cocaine topic. <u>See</u> 371 F. App'x at 930-31. That the officers and the interview room were the same for both the pre- and post-<u>Miranda</u> interrogation weighed "against the admissibility of the self-incriminating statements," but the Tenth Circuit did not find those two factors dispositive, and ruled that "the efficacy of the *Miranda* warnings would appear not to have been materially called into question." 371 F. App'x at 930-31.

The result was the same under Justice Kennedy's <u>Seibert</u> concurrence. <u>See</u> 371 F. App'x at 931-32. The Tenth Circuit concluded that there was no evidence of intent to circumvent <u>Miranda</u>: "to the contrary, the pre-*Miranda* statement occurred after the parties had bantered about the pursuit and in response to a question about the marijuana use of Mr. Crisp's female companion." 371 F. App'x at 932. Moreover, Crisp's pre-<u>Miranda</u> admissions "were unrelated to the post-*Miranda* statements regarding [the] cocaine." 371 F. App'x at 932. Accordingly, Crisp's statements were also admissible under the Kennedy <u>Seibert</u> concurrence.

Finally, there was no indicia of coercion surrounding Crisp's confession, so the statements were also admissible under the <u>Elstad</u> voluntary test. <u>See</u> 371 F. App'x at 932-33. The Tenth Circuit concluded that the following factors weighed toward finding his confession voluntary: (i) Crisp was thirty-nine years old; (ii) he was a high school graduate: (iii) he had experience with the criminal justice system based on his statement that "this ain't my first rodeo"; and (iv) he was not subjected to any physical punishment or threats of punishment. <u>See</u> 371 F. App'x at 932. Accordingly, the Tenth Circuit determined that under all three tests, Crisp's post-<u>Miranda</u> statements were admissible. <u>See</u> 371 F. App'x at 933.

<u>**ANALYSIS**</u>

The Court concludes that Garcia's statement that "Robert Gorence is my attorney" did not invoke his right to counsel, because Garcia was not interrogated in the squad car. Garcia's <u>Miranda</u> protections later triggered, however, at the New Mexico parole office facility. Although Sainato gave the <u>Miranda</u> warning sixteen minutes into the interrogation, the Court determines that Sainato did not withhold that warning intentionally. The Court will, thus, suppress Garcia's statements obtained before the <u>Miranda</u> warning, but not the statements he made afterwards.

I.    **GARCIA'S RIGHT TO COUNSEL DID NOT ATTACH IN THE SQUAD CAR, <u>BECAUSE HE WAS NOT YET SUBJECT TO CUSTODIAL INTERROGATION</u>.**

Garcia was not subject to custodial interrogation while he was in the squad car. As already noted, a suspect cannot invoke his <u>Miranda</u> rights anticipatorily; <u>Miranda</u> protections do not trigger until the suspect is subject to custodial interrogation. <u>See</u> <u>Montejo v. Louisiana</u>, 556 U.S. 778, 797 (2009)(citing <u>McNeil v. Wisconsin</u>, 501 U.S. at 182 n.3); <u>Appleby v. Cline</u>, __ F. App'x __, 2017 WL 4310267, at *2. Thus, Garcia may invoke his right to a lawyer only if he was subject to custodial interrogation. The Court, accordingly, must determine both whether Garcia was in custody and whether he was subject to interrogation. <u>See</u> <u>United States v. Cash</u>, 733 F.3d at 1277.

Garcia was in custody when he was placed in the police squad car. There are "[t]wo discrete inquiries . . . essential to the determination" of custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." <u>J.D.B. v. North Carolina</u>, 564 U.S. at 270. <u>See</u> <u>United States v. Erving L.</u>, 147 F.3d at 1245. Courts have typically recognized that, once a suspect is placed under formal arrest, custody exists. <u>See</u> <u>Berkemer v. McCarty</u>, 468 U.S. at 442 ("[R]espondent was not taken into custody for

the purposes of Miranda until Williams arrested him."); United States v. Cash, 733 F.3d at 1276 ("To be in custody, a person must be under formal arrest or have his freedom of action . . . curtailed to a degree associated with formal arrest.")(citations omitted). Garcia was under formal arrest before being placed in the car. See April Tr. at 133:24-134:3 (Lerner, Sirignano); id. at 141:11-13 (Lerner, Sirignano). Garcia, thus, was in custody.

Garcia, however, was not subject to interrogation while in the squad car. "[I]nterrogation extends *only* to words or actions that the officers should have known were reasonably likely to elicit an incriminating response." United States v. Cash, 733 F.3d at 1277 (emphasis in original). This inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Rhode Island v. Innis, 446 U.S. at 301. See United States v. Yepa, 862 F.3d at 1257. Lerner asked Garcia no questions in the car. See April Tr. at 141:9-10 (Lerner); id. at 159:1-2 (Lerner). Although express questioning is not required for interrogation to occur, see Rhode Island v. Innis, 446 U.S. at 298, Lerner's statements were also not "reasonably likely to elicit an incriminating response from the suspect," 446 U.S. at 301. See United States v. Cash, 733 F.3d at 1277. Lerner's statements to Garcia in the car, instead, appear informational. Lerner said he "explained to [Garcia] what was going to happen, and that was it." April Tr. at 155:24-25 (Lerner). Lerner also noted that he introduced himself to Garcia, see April Tr. at 159:4-5 (Lerner), but otherwise Lerner reiterated that he explained to Garcia "this is what's going on, we're going to the FBI," April Tr. at 158:2-5 (Lerner).

Introducing oneself and telling a suspect that they were heading to the FBI is not reasonably likely to prompt a suspect to blurt out an incriminating statement. It does not prompt the suspect with a question that a suspect might feel compelled to answer, nor is it "designed to establish that the defendant was in fact guilty as a predicate for further interrogation." Rhode

- 49 -

Island v. Innis, 446 U.S. at 299. In context, Lerner's statements appear informative and not accusatory. Certainly, his remarks could prompt an incriminating response if they were phrased as threats -- for example, if the context suggested that the suspect needed to talk or they "were going to the FBI" -- but no evidence suggests that Lerner phrased his comments threateningly.

Accordingly, the Court concludes that Lerner's introductory and informational statements to Garcia in the squad car were not an interrogation. See Fox v. Ward, 200 F.3d at 1298 (concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their business cards does not constitute interrogation). See also Rhode Island v. Innis, 446 U.S. at 301 (holding that "interrogation" does not include those statements and actions "normally attendant to arrest and custody"); United States v. Yepa, 862 F.3d at 1259 (concluding that officer's statements that "[h]e's a tough guy" and "[y]ou're not a real modest guy, are you?" would not "likely lead [the] Defendant to incriminate himself" based on the "business-like but polite . . . tone of the officer's statements"). Although Garcia responded to Lerner's squad-car comments by saying "[m]y attorney is Robert Gorence," April Tr. at 4-5 (Lerner), Garcia could not, at that time, assert his right to an attorney, because he was not yet subject to custodial interrogation, see United States v. Cook, 599 F.3d at 1214 ("[I]n order to implicate *Miranda* and *Edwards*, there must be a custodial interrogation.").[23] Accordingly, the Court will not suppress Garcia's subsequent statements on the ground that he invoked his right to an attorney in the squad car.

_____

[23]In so ruling, the Court notes that United States v. Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998)("Bautista") held that interrogation "includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent." Bautista, 145 F.3d at 1147 n.3 (citing United States v. Kelsey, 951 F.2d at 1198-99 ("Kelsey")("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")). Those cases suggest that Garcia was subject to interrogation in the squad car, and thus could assert his Fifth Amendment right to an attorney, because Lerner's statement that "they were going to the FBI" makes it clear that "questioning/interrogation is imminent." Bautista, 145 F.3d at 1147 n.3. The Court diverges

from those holdings, because subsequent Tenth Circuit caselaw implicitly repudiates them. Bautista and Kelsey were decided in 1998 and 1991 respectively. Since then, the Tenth Circuit decided United States v. Cook, United States v. Cash, and United States v. Yepa in 2010, 2013, and 2017 respectively. In each of the later cases, questioning was either imminent or actually occurring, but the Tenth Circuit did not hold that there was an interrogation, because the statements officers made were not "reasonably likely to elicit an incriminating response." E.g., United States v. Yepa, 862 F.3d at 1257 ("Yepa"). In United States v. Cash, 733 F.3d at 1264, ("Cash"), for example, a suspect was detained in the back of a squad car, much like Garcia was, and was questioned, but the Tenth Circuit determined that the officers did not interrogate him. Cash, 733 F.3d at 1270, 1278-79.

A 2012 decision, however, that the honorable Paul Kelly, Tenth Circuit Judge, wrote and the honorable Stephanie Seymour, Tenth Circuit Judge, joined, the Tenth Circuit reaffirmed the rule from Kelsey concluding that, "because interrogation was imminent, [the defendant] could properly invoke his right to counsel." United States v. Santistevan, 701 F.3d 1289, 1294 (10th Cir. 2012)("Santistevan")(citing Kelsey, 951 F.2d at 1198-99). The Honorable Timothy Tymkovich, then Circuit Judge -- and now Chief Judge -- of the Tenth Circuit, dissented on other grounds. Santistevan, 701 F.3d at 1295 (Tymkovich, J., dissenting). In a later opinion, however, that the Honorable Charles Matheson, Tenth Circuit Judge, authored and Judge Kelly with the Honorable Robert Blackburn, sitting by designation from the United States District Court for the District of Colorado, joined, the Tenth Circuit concluded that an "'interrogation extends *only* to words or actions that the officers should have known were reasonably likely to elicit an incriminating response.'" Cash, 733 F.3d at 1277 (quoting Fox v. Ward, 200 F.3d at 1298)(emphasis in Cash). The Tenth Circuit's emphasis on "only" signals to the Court that the only test for interrogation is the one in Cash, which is also the only test the Supreme Court has given. See Rhode Island v. Innis, 446 U.S. at 301.

Indeed, it appears to the Court that United States v. Cook, Cash, and Yepa are a more faithful application of the Supreme Court's ruling in Rhode Island v. Innis than the rulings in Bautista, Kelsey, and Santistevan. Rhode Island v. Innis requires some action by officers "reasonably likely to elicit an incriminating response" for an interrogation to exist, 446 U.S. at 301, whereas an interrogation could exist under Bautista and Kelsey with no such action prompting an incriminating response, so long as it was clear that interrogation was imminent, see Bautista, 145 F.3d at 1147 n.3. For example, if a suspect is arrested and placed in an interrogation room by himself, there is likely an interrogation under Bautista and Kelsey, but no interrogation under Rhode Island v. Innis. The holdings, thus, appear at odds. While the Tenth Circuit can add to a Supreme Court test, they cannot overrule one. The "imminence" test may also greatly erode the Rhode Island v. Innis test, because questioning is almost always imminent after an arrest. From this observation, and the other Tenth Circuit precedent discussed above, the Court concludes that Bautista, Kelsey, and Santistevan do not control this case.

## II. THE COURT WILL SUPPRESS THE STATEMENTS GARCIA MADE BEFORE THE <u>MIRANDA</u> WARNING, BUT WILL NOT SUPPRESS THE STATEMENTS HE MADE AFTER THE WARNING.

<u>Miranda</u> protections apply once a suspect is subject to custodial interrogation. As already established, Garcia was in custody in the squad car, because he was under formal arrest. He remained in custody once he was transported to the New Mexico Parole facility for questioning, because he stayed under arrest. Garcia was also subject to interrogation during the interview, because Lerner and Sainato initiated express questioning. <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. at 301 ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."); <u>Berkemer v. McCarty</u>, 468 U.S. at 428 ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."). Sainato instigates Garcia's questioning. <u>See</u> Int. Tr. at 3:1-8 (Sainato). Moreover, the pre-<u>Miranda</u> transcript is replete with express questions that "were reasonably likely to elicit an incriminating statement." <u>Cash</u>, 733 F.3d at 1277.[24] For example, at the beginning of the interview, after first asking for Garcia's name for the record, Sainato states:

---

[24]Although the Supreme Court has suggested that express questioning from an officer after custody is enough to equal "interrogation," <u>Rhode Island v. Innis</u>, 446 U.S. at 301, the Tenth Circuit has stated:

Not every sentence punctuated by a question mark constitutes an interrogation. "Express Questioning" cannot sweep so broadly. Asking "how's it going?" is a far cry from "where were you on the night of the murder?" . . . Thus, although asking a question is relevant to determining whether an interrogation occurred, it is neither sufficient nor necessary. Instead, we must inquire whether law enforcement officials should have known that their words or actions -- whether

- 52 -

I know you saw your other boys around here, so it's kind of an ongoing investigation on the S.[25]  I think you know -- well, I know you know that -- who was it?  Was it Red and Shadow put out a hit on Gregg M[a]rcantel, Secretary of Corrections?  I know you know.

Int. Tr. at 3:12-17 (Sainato).  Sainato should have known that such a question was reasonably likely to elicit an incriminating response, as one likely response to this question is: "Yes I know who did it -- Shadow did."  That response would not only establish that Garcia had knowledge of the hit and who did it, which in itself is incriminating, but might also suggest that Garcia -- as someone who has knowledge of SNM's assassination activities -- is a member of SNM.[26]  The following additional examples are also illustrative of questions asked that were reasonably likely to elicit an incriminating response:

- "When were you brought into the S, what year?"  Int. Tr. at 5:16-17 (Lerner).

- "So who brought you in [to SNM]?"  Int. Tr. at 7:16 (Lerner).

- "So when you get in there, you got to -- you have to do something to get in, right? How did you earn your bones? . . .  I mean, did you beat someone up?  Did you go on a mission? What did you do?"  Int. Tr. at 9:1-6 (Lerner).

---

framed as a question or not -- were reasonably likely to elicit an incriminating statement.

Cash, 733 F.3d at 1277.  Thus, the Tenth Circuit has taken the disjunctive test from Rhode Island v. Ennis and collapsed it into one inquiry.  Whether the Tenth Circuit may collapse the test, as a matter of vertical stare decisis, is questionable.  Moreover, Rhode Island v. Innis' test likely captures the routine or conversational questions with which the Tenth Circuit seemed concerned in Cash.  See Rhode Island v. Innis, 446 U.S. at 301 (holding that interrogation does not include "words or actions . . .  normally attendant to arrest and custody").  However, because Tenth Circuit decisions bind the Court, the Court considers both whether there was express questioning and whether the officers should have known their actions or questions were reasonably likely to elicit an incriminating response.

[25]Lerner and Sainato refer to "S" throughout the transcript, but Sainato clarified later that "S" stood for SNM.  May Tr. at 31:12-16 (Sainato).

[26]The United States has the burden of proving, as an element in the upcoming case, Garcia's SNM membership.  See Indictment at 15.

- "So who's -- who was leading you guys when you came in?  Was it Styx?"  Int. Tr. at 12:19-21 (Sainato).

Accordingly, Garcia's <u>Miranda</u> protections triggered once Sainato and Lerner started asking questions New Mexico probation facility.  <u>See</u> <u>United States v. Cook</u>, 599 F.3d at 1214.  That neither Sainato nor Lerner issued a <u>Miranda</u> warning before the interview means that any incriminating statements which Garcia made before the <u>Miranda</u> warning must be excluded.  <u>See</u> <u>United States v. Minjares-Alvarez</u>, 264 F.3d 980, 984 (10th Cir. 2001)("[A] defendant's post-arrest statements must therefore be excluded unless the defendant was first notified of his *Miranda* rights.").

About sixteen minutes into the interview, Sainato gave Garcia a <u>Miranda</u> warning.  <u>See</u> Int. Tr. at 20:21-21:6 (Sainato).  The Court concludes that Garcia then knowingly, intelligently, and voluntarily waived those rights.  <u>See</u> <u>United States v. Burson</u>, 531 F.3d at 1256.  To determine waiver, the Court looks to the totality of the circumstances with an eye toward the following factors: "the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect."  <u>United States v. Smith</u>, 606 F.3d at 1276 (citations omitted).  After Sainato gave the <u>Miranda</u> warning, Garcia signed a written waiver of rights, <u>see</u> Advice of Rights at 1, and affirmed aloud that "I have read this statement of rights.  I understand what my rights are.  At this time I am willing to answer questions without a lawyer present," Int. Tr. at 21:8-11 (Garcia).   Garcia later stated, after Sainato expressed some dismay at failing to read Garcia's <u>Miranda</u> rights initially, that "I can even say on the recording that I understand what happened and everything is fine.  I'm not against it.  You know what I mean?"  Int. Tr. at 21:20-23 (Garcia).  Garcia was forty years old in December, 2015.  <u>See</u> Patient History at 1.  His level of education is unclear.  Before the interrogation began, Garcia

- 54 -

had been in custody for about two hours, <u>see</u> May Tr. at 22:23-25 (Adams, Sainato)(affirming that Garcia was taken into custody at 4:15 a.m.), and the interrogation lasted about three hours, <u>see</u> Int. Tr. at 3:5-6 (Sainato)(noting that the interview started at 5:55 a.m.); <u>id.</u> at 211:7-8 (Sainato)(stating that the interview had taken three hours).  He waived his <u>Miranda</u> rights only about two hours into custody.  <u>See</u> Int. Tr. at 20:20-21 (Sainato); <u>id.</u> at 21:7-13 (Garcia, Sainato). Garcia was given food and water during the interview.  <u>See</u> April Tr. at 175:8-10 (Lerner); May Tr. at 118:19 (Sainato).  At no point during the interview did Sainato, Lerner, or the other two FBI agents who briefly joined the interrogation use or threaten to use physical force against Garcia.  <u>See generally</u> Int. Tr. at 3:1-214:8.  Garcia was not handcuffed for the interview.  May Tr. at 25:4-5 (Sainato).

On those facts, the Court concludes that Garcia's waiver was knowing, intelligent, and voluntary.  <u>See United States v. Smith</u>, 606 F.3d at 1277.  Indeed, on highly similar facts, the Tenth Circuit affirmed, in <u>United States v. Smith</u>, a district court's determination of a voluntary <u>Miranda</u> waiver.  606 F.3d at 1277.  In that case, the Tenth Circuit held:

> The record likewise demonstrates Smith's waiver of his rights was voluntary. When Smith waived his *Miranda* rights, he was nearly 21 years of age and had completed the tenth grade. Smith waived his rights after he had been informed of them both orally by Agent Sayegh and in writing through the advice of rights form.  Prior to waiving his rights, Smith had been under arrest for approximately three hours but had not been questioned.  The interview took place in a room large enough to accommodate adequately the interviewers. Smith was not handcuffed during the interview.  Additionally, there is no indication in the record that Smith was treated impolitely or touched forcefully while being interviewed.

606 F.3d at 1277.  The Court sees no reason to diverge from that holding, and concludes that Garcia knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights after Sainato gave him the warning.

Garcia contends, however, that his waiver could not have been voluntary, because he was intoxicated on Xanax and Oxycodone. See Motion to Suppress at 2, 8.[27] Although intoxication bears on the waiver analysis, "[t]he state of intoxication does not automatically render a statement involuntary." United States v. Smith, 606 F.3d at 1276. See United States v. Augustine, 742 F.3d 1258, 1265 (10th Cir. 2014). "[A] defendant must be impaired to a substantial degree to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination." United States v. Augustine, 742 F.3d at 1265. While the record supports that Garcia used the two drugs at some point before the interview, it does not reveal how much he ingested and it suggests that Garcia took them on December 2, 2015 -- the day before the interview. See Intake Screen at 1 (noting that Garcia had ingested Xanax and Oxycodone two days before December 4, 2015). Both Lerner and Sainato affirmed that Garcia was lucid for the interview. See April Tr. at 177:14 (Lerner)("He was coherent, yes, he was."); May Tr. at 119:23-120:4 (Armijo, Sainato). After listening to the interview's tape recording, the Court agrees with Lerner and Sainato. Before the Miranda warning, Garcia speaks in a thick, throaty voice, which might indicate intoxication -- or merely the early morning hour -- but at almost all times Garcia responds quickly and responsively to questions. See Interview Recording 0:01-15:37 (Garcia, Lerner, Sainato). Based on that responsiveness, the Court credits Lerner's and Sainato's testimony and concludes that whatever amount of Oxycodone or Xanax

---

[27]In Garcia's Motion to Suppress, he states that he was high on Hydrocodone and Xanax for the interview. See Motion to Suppress 2, 8. Hydrocodone is a different drug from Oxycodone. Compare Hydrocodone-Acetaminophen, WebMD, https://www.webmd.com/drugs/2/drug-251/hydrocodone-acetaminophen-oral/details with Oxycodone HCL solution, WebMD, https://www.webmd.com/drugs/2/drug-1025-5278/oxycodone-oral/oxycodone-oral/details. The record supports Garcia using Oxycodone and not Hydrocone. See Patient History at 2. The Court, accordingly, addresses only Garcia's Oxycodone and Xanax use.

was in Garcia's system did not "impair[ him] to a substantial degree."  United States v. Augustine, 742 F.3d at 1265.

Garcia also argues that the Court must suppress his statements after the Miranda warning, because they were obtained using an improper two-step Miranda process.  See Motion to Suppress at 7.  In analyzing this argument, the Court adopts Justice Kennedy's concurrence from Seibert, as Judge Ebel did in United States v. Sanchez-Gallegos and as the vast majority of United States Courts of Appeals have.[28]  See, e.g., United States v. Sanchez-Gallegos, 412 F.

---

[28]The Court concludes that Justice Kennedy's concurrence is the narrowest holding from Seibert, so it is controlling.  See Marks v. United States, 430 U.S. 188, 193 (1977); Large v. Fremont County, 670 F.3d 1133, 1141 (10th Cir. 2012)("[T]he Marks rule produces a determinative holding only when one opinion is a logical subset of other, broader opinions.").  The Kennedy concurrence is narrower, because it excludes evidence only when officers subjectively intend to circumvent Miranda, whereas the Seibert plurality opinion excludes evidence when objective factors indicate that the Miranda warning was ineffective, which would, almost always, capture those instances when the officers subjectively intend to thwart Miranda as well as instances where there is no such intent.  See Seibert, 542 U.S. at 621 (Kennedy, J., concurring)("The [plurality's] test envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations.");  United States v. Williams, 435 F.3d 1148, 1158 (9th Cir. 2006)("[B]oth the plurality and Justice Kennedy agree that where law enforcement officers deliberately employ a two-step interrogation . . . the trial court should suppress the confession.")(emphasis in original).  Indeed, three of the plurality's five factors are objective indications of subjective intent to frustrate Miranda.  See Seibert, 542 U.S. at 615 (listing the following factors: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements . . . and the degree to which the interrogator's questions treated the second round as continuous with the first.").  Thus, the plurality opinion will, on balance, exclude more evidence than Justice Kennedy's concurrence, so the concurrence is narrower.  Seen in another light, Justice Kennedy's concurrence is narrower than the plurality's opinion in that the concurrence does not overrule Elstad, whereas the plurality opinion arguably does.  See United States v. Carter, 489 F.3d 528 (2d Cir. 2007)(framing the inquiry which opinion controls in terms of whether Seibert overruled Elstad).  For the reasons expressed above, the Court determines that it must adopt Justice Kennedy's concurrence.  It will, however, also consider the plurality's factors below.

If the Court could write on a blank slate, it would adopt Justice O'Connor's dissent from Seibert, which reaffirmed the voluntariness test from Elstad.  In the Court's view, voluntariness is the appropriate inquiry under the Fifth Amendment, and, thus, focusing on the officer's subjective intent misses the mark.  Seibert's plurality also veers too far from the Fifth Amendment.  Its test's effect is the suppression of evidence even in circumstances when the

App'x at 72; United States v. Capers, 627 F.3d 470, 476 (2d Cir. 2010); United States v. Torres-Lona, 491 F.3d 750, 758 (8th Cir. 2007); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006); United States v. Williams, 435 F.3d 1148, 1157 (9th Cir. 2006); United States v. Naranjo, 426 F.3d 221, 231 (3d Cir. 2005); United States v. Mashburn, 406 F.3d 303, 309 (4th Cir. 2005).  But see United States v. Heron, 564 F.3d 879, 884 (7th Cir. 2009).  Accordingly, the Court must determine whether Sainato and Lerner "deliberate[ly]" employed a "two-step" strategy to circumvent Miranda, and if they did, whether they took "curative measures . . . designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver."  Seibert, 542 U.S. at 622 (Kennedy, J., concurring).  If Sainato and Lerner did not deliberately employ such a strategy, the voluntary test from Elstad controls.  See Seibert, 542 U.S. at 622 (Kennedy, J., concurring)("The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed.").   "As in any such [voluntary] inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of the statements."   Elstad, 470 U.S. at 318.   The Elstad voluntariness test applies the same factors as any other voluntariness inquiry: "(1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment."   United States v. Carrizales-Toledo, 454 F.3d at 1153.

---

suspect voluntarily gave up information both pre- and post-Miranda warning.  The Court, however, is not free to follow the dissent, so it will apply Justice Kennedy's test and also the plurality's below.

The Court concludes that Lerner and Sainato did not deliberately intend to question first and Mirandize later. Sainato testifies that:

> As you can see in the transcript, on the first page or two I'm cut off pretty quick, and then I kind of got sidetracked as Sergeant Lerner started asking questions and talking to him, at which point, I legitimately forgot to [give the warning].

May Tr. at 30:10-15 (Sainato). The Court agrees with this characterization. Listening to the recording, Sainato sounds sheepish when he realizes that he forgot to give Garcia the <u>Miranda</u> warning. <u>See</u> Interview Recording at 15:07-15:28 (Sainato). Moreover, the Court concludes that it is unlikely that either Lerner or Sainato intended to employ a two-step strategy as they do not ask Garcia about the information they want most -- Garcia's connection to the gun -- until well after reading Garcia his <u>Miranda</u> rights. <u>See</u>, <u>e.g.</u>, Int. Tr. at 88:1-125:11 (Garcia, Lerner, Sainato). Had they intended to obtain a damning confession first, give a <u>Miranda</u> warning, and then re-obtain the confession, as the officers did in <u>Seibert</u>, 542 U.S. at 605-06, Lerner and Sainato would have asked those incriminating questions much earlier,[29] <u>cf.</u> <u>United States v. Crisp</u>, 371 F. App'x at 932 ("The pre-*Miranda* statements also were unrelated to the post-*Miranda* statements."). Indeed, Sainato rejected the need to review already-questioned material. <u>See</u> Interview Recording at 16:19-21 (Lerner, Sainato)("Lerner: So now we're going to have to go over everything again? Sainato: Nah."). From that evidence, the Court concludes that neither Sainato nor Lerner intended to foil <u>Miranda</u> with their midstream warning.[30]

---

[29]The Court notes that this analysis mirrors two factors from the plurality in <u>Seibert</u>: the completeness and detail of the questions and answers in the first round of interrogation, and the overlapping content of the two statements. <u>See</u> <u>Seibert</u>, 542 U.S. at 615. The Court is not applying the plurality's factor balancing test here. Rather, it applies this analysis, because these facts are objective indications of Sainato's and Lerner's subjective intent.

[30]As already noted, on a clean slate, the Court would not employ this test, but instead would analyze Garcia's interview under <u>Elstad</u>'s voluntary inquiry. <u>See</u> <u>supra</u>, n.28. Under that test, it would not suppress the statements, because Garcia's statements were voluntary. <u>See</u>

Because Sainato and Lerner did not deliberately employ a two-step procedure to circumvent Miranda, the Court must determine whether Garcia made his statements voluntarily. See Seibert, 542 U.S. at 622 (Kennedy, J., concurring); See United States v. Carrizales-Toledo, 454 F.3d at 1153. The Court has already considered the voluntariness factors during its Miranda waiver analysis, supra, at 54-57, and concludes that there are no additional facts from the course of the interview suggesting that the interrogation ever became unconstitutionally coercive. Indeed, in addition to the factors already analyzed, the Court notes that Garcia is talkative during almost the entire interview suggesting that his statements throughout were voluntary. See generally Int. Tr. at 3:1-214:8.[31] The Court, therefore, will not suppress the statements that Garcia made after his Miranda waiver.

The Court would come to the same conclusion applying the plurality decision from Seibert.[32] Under the plurality decision, the Court must consider:

[i)] the completeness and detail of the questions and answers in the first round of interrogation, [(ii)] the overlapping content of the two statements, [(iii)] the

_____

supra, 54-57; infra, at 60.

[31]Garcia also argues that the Court must suppress his statements, because, under the totality of the circumstances, he did not give his statements voluntarily. See Motion to Suppress at 9-10. The voluntariness factors that the Court must consider are identical under Elstad, under the totality of the circumstances, and under Miranda waiver. Compare United States v. Carrizales-Toledo, 454 F.3d at 1153 (concluding statements were voluntarily made, because the suspect incriminated himself "after being detained for less than a few minutes . . . in response to a single open-ended question," and the suspect "does not claim that he was subjected to any physical punishments or threats.") with United States v. Smith, 606 F.3d at 1276 ("A waiver of Miranda rights must be made voluntarily, knowingly, and intelligently. . . . The same factors are assessed in determining whether a confession was voluntarily given.") and United States v. Lopez, 437 F.3d 1059, 1063-64 (10th Cir. 2006). For the reasons set forth above, the Court concludes that, considering the totality of the circumstances, the interview was voluntary.

[32]As already noted, on a clean slate, the Court would not employ this test, but instead would analyze Garcia's interview only under Elstad's voluntary inquiry. See supra, n.28. Under that test, it would not suppress the statements, because Garcia's statements were voluntary. See supra, at 54-57, 60.

timing and setting of the first and second, [(iv)] the continuity of police personnel, and [(v)] the degree to which the interrogator's questions treated the second round as continuous with the first.

Seibert, 542 U.S. at 615.  As already detailed briefly, the pre-Miranda interrogation was not complete, nor did the pre- and post-Miranda interrogations significantly overlap.  The pre-Miranda questioning was fifteen minutes of a three hour interview.  It covered how Garcia became involved in SNM and what he might generally know about its leadership.  See, e.g., Int. Tr. at 5:4-6 (Lerner); id. at 5:15-17 (Lerner); id. at 7:19 (Sainato).  In contrast, the remaining two hours and forty five minutes post-Miranda was far more invasive and exhaustive.  Most importantly, Lerner and Sainato questioned Garcia extensively about his connection to and possession of a gun, which was to be used later by Mario Montoya in the murder or murders of senior New Mexico Department of Corrections staff.  See, e.g., Int. Tr. at 88:1-125:11 (Garcia, Lerner, Sainato); id. at 127:1-131:7 (Garcia, Lerner, Sainato); id. at 140:5-158:23 (Garcia, Lerner, Sainato).  Lerner and Sainato did not mention the gun at all before the Miranda warning.  Their post-Miranda interrogation also covered what Garcia knew about several unsolved homicides; also another topic not touched upon pre-warning.  See Int. Tr. at 137:23-140:2 (Garcia, Sainato); id. at 147:9-17 (Garcia, Lerner); id. at 174:16-177:20 (Acee, Garcia, Lerner, Myers, Sainato); id. at 179:1-181:9 (Garcia, Lerner, Myers, Sainato).  Although both the pre- and post-Miranda interviews encompass roughly the same general topic -- SNM -- the Court concludes that the general similarity does not amount to the "overlapping content" that the Seibert plurality carved out as a factor.  Seibert, 542 U.S. at 615-16 (concluding that the first round of interrogation was complete and overlapping with the second round when the unwarned interrogation's "questioning was systematic [and] exhaustive. . . .  When the police were finished

there was little, if anything, of incriminating potential left unsaid").  The first two factors, therefore, weigh toward admissibility.

The timing, setting, and the continuity of the police personnel, however, weigh toward suppressing the statements.  There was no meaningful break in the interview.  <u>See</u> <u>generally</u> Int. Tr. at 3:1-214:8.  The interview took place in one room.  <u>See</u> <u>generally</u> Int. Tr. at 3:1-214:8.  The police personnel stayed the same except for two additional FBI agents' brief appearance.  <u>See</u> Int. Tr. at 158:24-159:3 (Acee, Lerner, Myers).  <u>See</u> <u>generally</u> Int. Tr. at 3:1-214:8; <u>United States</u> <u>v. Crisp</u>, 371 F. App'x at 930-31 (concluding that the third and fourth <u>Seibert</u> factors weighed toward excluding the statements when the interrogations "occurred in the same interview room," the only break was the time to read the <u>Miranda</u> warnings, and the "same officers were present at each interrogation").

The final factor -- the degree to which the interrogator's questions treated the pre- and post-<u>Miranda</u> rounds as continuous with the first -- also weighs toward suppressing the statements, because Lerner's first question after the <u>Miranda</u> warning was about a subject discussed during the pre-<u>Miranda</u> interview.  <u>See</u> Int. Tr. at 22:2 (Lerner)("Let's get back to Styx.").  The Court concludes, however, that this factor only weighs slightly toward suppression. In <u>Seibert</u>, the plurality concluded that the final factor weighed toward suppression, because the officer made repeated "references back to the confession already given," making it "unnatural" for the suspect to "refuse to repeat at the second stage what had been said before."  <u>Seibert</u>, 542 U.S. at 616.  That situation is not what occurred here.  Apart from resuming discussion of "Styx," Lerner and Sainato did not repeatedly refer back to the pre-<u>Miranda</u> interrogation.  <u>See</u> <u>generally</u> Int. Tr. at 21:24-214:8.  Accordingly, the Court determines that Garcia would not have

felt locked into a previous confession.  The Court concludes, thus, that the final factor weighs only slightly toward excluding the statements.

Although three factors weigh toward excluding the statements, the Court will not exclude the statements.  The plurality's factors inform an ultimate test: "whether it would be reasonable to find that in these circumstances the warnings could function effectively."  <u>Seibert</u>, 542 U.S. at 611.  The Court concludes that, considering all the factors, a <u>Miranda</u> warning could still have effectively informed Garcia of his rights such that he could make a voluntary decision.  The plurality was most worried that a <u>Miranda</u> warning would not operate effectively if the suspect had confessed to most everything before the <u>Miranda</u> warning: "Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again."  <u>Seibert</u>, 542 U.S. at 613.  With that in mind, the first two factors bear more heavily on the Court's analysis here.  Garcia had not "given up the game" during the interview's first fifteen minutes.  He may have divulged some incriminating statements about himself -- membership in SNM, for example -- but giving up his membership would not have reduced Garcia to "bewilderment" about "the reason for discussing rights at that point."  <u>Seibert</u>, 542 U.S. at 613.  Garcia had not confessed to a murder and then been warned as the suspect had been in <u>Seibert</u>.  <u>See</u> 542 U.S. at 604.  Indeed, Lerner and Sainato immediately signaled to Garcia that they already knew he was an SNM member, <u>see</u> Int. Tr. at 3:12-14 (Sainato)("I know you saw your other boys around here, so it's kind of an ongoing investigation on the S."), so Garcia would not have thought he was giving up much, if anything, by admitting his involvement with SNM.  Given that context, and considering the factors, the Court concludes

that the <u>Miranda</u> warning did not fall on deaf ears. Therefore, under the <u>Seibert</u> plurality, it will not suppress the post-<u>Miranda</u> statements.

**IT IS ORDERED** that the requests in the Defendant Christopher Garcia's Sealed Motion to Suppress Statements by Defendant Obtained in Violation of *Miranda v. Arizona*; Motion to Suppress Involuntary Statements by Defendant; Request for Hearing Pursuant to 18 U.S.C. § 3501, filed March 1, 2017 (Doc. 184), are granted in part and denied in part. Any statements Garcia made during the interrogation before the <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)("<u>Miranda</u>") warning are suppressed, but statements he made after the <u>Miranda</u> warning are not suppressed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James D. Tierney
  Acting United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

       *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

  *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

  *Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

  *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

  *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

  *Attorneys for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

     *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

     *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

     *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and--

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

     *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

     *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

     *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

      *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

      *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

      *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

      *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

     *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

     *Attorneys for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

     *Attorneys for Defendant Brandy Rodriguez*